UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBERT W. CARLISLE,

                                Plaintiff,                    7:15-CV-1376
                                                              (GTS/ATB)
v.

UNITED PARCEL SERVICE, INC.; and
TEAMSTERS LOCAL 687, an Affiliate of the
International Brotherhood of Teamsters,

                                Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

BLAU LEONARD LAW GROUP, LLC                     SHELLY A. LEONARD, ESQ.
  Counsel for Plaintiff                         STEVEN BENNETT BLAU, ESQ.
23 Green St., Suite 303
Huntington, NY 11743

EPSTEIN BECKER & GREEN P.C.                     JEREMY M. BROWN, ESQ.
  Counsel for Defendant United Parcel           YAEL SPIEWAK, ESQ.
  Service, Inc.
250 Park Ave.
New York, NY 10117

SATTER LAW FIRM, PLLC                           MIMI C. SATTER, ESQ.
  Counsel for Defendant Teamsters
  Local 687
217 S. Salina St., 6th Fl.
Syracuse, NY 13202

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this Labor Management Relations Act ("LMRA") action,

filed by Robert W. Carlisle ("Plaintiff") against United Parcel Service, Inc., and Teamsters Local

687, an affiliate of the International Brotherhood of Teamsters ("Defendants"), are Defendants'

respective motions for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. Nos. 20-21, 23.)

 For the reasons set forth below, Defendants' motions are granted.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Complaint

Generally, Plaintiff's Complaint alleges as follows.  Plaintiff was employed by Defendant

United Parcel Service, Inc. ("UPS") as a package driver for approximately 25 years at UPS's

Potsdam, New York, facility.  (Dkt. No. 1 at ¶ 9 [Plf.'s Compl.].)  During the relevant period,

Plaintiff was covered by a collective bargaining agreement ("CBA"), entered into between UPS

and the International Brotherhood of Teamsters, the local affiliate of which is Defendant

Teamsters Local 687 ("Local 687" or "the Union").  (*Id.* at ¶ 10.)

In December 2013, Plaintiff complained to UPS management that his delivery truck was

"continuously filling with smoke fumes, causing him to be lightheaded, dizzy, and nauseous,"

and threatened to notify the Occupational Safety and Health Administration ("OSHA") if his

"concern was not addressed in a timely manner."  (*Id.* at ¶¶ 11-12.)  UPS management

"responded and proceeded to resolve this situation," but the problem returned in January 2015.

(*Id.* at ¶ 14.)  Despite the "unsafe work condition" created by the "noxious interior cab

environment," Plaintiff's manager, Joelle Sebastian-Dean, insisted that he continue to drive the

vehicle.  (*Id.*)  In February 2015, Plaintiff filed a complaint against UPS with OSHA, alleging

"possible overexposure to carbon monoxide due to poor running vehicles."  (*Id.* at ¶ 15.)

Thereafter, Plaintiff was subjected to "multiple retaliatory adverse employment actions"

based upon prohibited considerations.  (*Id.* at ¶ 16.)  More specifically, the following events

transpired after Plaintiff filed his OSHA complaint: (1) on March 3, 2015, Plaintiff was issued a

warning letter for failing to report an injury that he sustained two weeks earlier; (2) on March 5,

2015, Plaintiff was issued a "suspension and warning letter" for refusing to "stack packages he

was delivering onto a loading dock which had an ice accumulation"; (3) Plaintiff filed grievances with respect to both of these instances of discipline; (4) as a result of his suspension, Plaintiff filed a complaint with OSHA, alleging retaliatory employment practices in violation of the whistleblower provisions of the Occupational Safety and Health Act, 29 U.S.C. § 660(c); (5) on April 3, 2015, Plaintiff was subjected to "further retaliatory discipline" when he was suspended for three days, allegedly for violating an unwritten policy requiring him to call the "private cell phone of his immediate supervisor" to advise the supervisor that Plaintiff would be taking longer than anticipated to complete his delivery route; (6) on April 7, 2015, Plaintiff was issued a five-day suspension for "failing to follow methods, procedures, and instructions to communicate with his center team regarding completion of his delivery route"; (7) on April 17, 2015, Plaintiff received an "official discharge notice" and, on the same date, he filed an amended whistleblower complaint against UPS pursuant to the Surface Transportation Assistance Act, 49 U.S.C. § 31105; (8) on June 4, 2015, Plaintiff was issued a "working discharge" from UPS for allegedly failing to follow proper safety methods, procedures, and instructions when he drove a golf cart onto UPS property while scheduled to be on vacation; (9) on September 16, 2015, an arbitration panel denied Plaintiff's grievances and affirmed his permanent discharge.  (*Id.* at ¶¶ 17-26.)

Based upon these factual allegations, Plaintiff asserts a "hybrid" claim pursuant to section 301 of the LMRA, 29 U.S.C. § 185(a), embodied in two related "[c]ounts": (1) a claim that Local 687 breached its duty of fair representation by (among other things) failing to properly investigate and prepare Plaintiff's grievances against UPS, recklessly handling Plaintiff's grievances and defense, and discriminating against him based on his complaints that Brian Hammond, the president of Local 687, had engaged in "prohibited activities and irregularities" in

his duties and had a "sweetheart deal" with UPS that resulted in a conflict of interest; and (2) a claim that UPS breached the CBA by (a) requiring Plaintiff to drive an unsafe delivery vehicle, (b) requiring him to "engage in activities involving dangerous conditions of work," (c) retaliating against him (in the form of "intimidation, harassment, coercion, discipline and adverse employment actions") for filing an OSHA complaint regarding his work vehicle, and (d) disciplining, suspending, and terminating him without just cause. (*Id.* at ¶¶ 27-61.)

Familiarity with the factual allegations supporting the claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties.

**B.    Undisputed Material Facts on Defendants' Respective Motions for Summary Judgment**

Before reciting the undisputed facts material to Defendants' motions, the Court must address four issues it has identified in Plaintiff's responses Defendants' respective statements of material facts ("Rule 7.1 Statement"), filed pursuant to Local Rule 7.1(a)(3) of the Court's Local Rules of Practice.

First, throughout Plaintiff's responses ("Rule 7.1 Response"), there are several instances in which he responds that a fact is either "Undisputed"or  "Disputed," but (in either case) then asserts additional facts (not directly responsive to the fact asserted) and/or makes legal arguments in those responses. (*See*, *e.g.*, Dkt. No. 30 at ¶¶ 69-71, 81-82, 107-08, 143, 145, 148, 158, 175-76, 220-21 [Plf.'s Rule 7.1 Response to Union].)  Where this occurs (and unless Plaintiff has supported a denial with a citation to the record where a factual dispute actually arises), the Court will deem those facts admitted and disregard the additional facts and/or legal argument asserted by Plaintiff. *See CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided

by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which [wa]s to 'spin' the impact of the admissions plaintiff has been compelled to make").  To the extent that Plaintiff desired to set forth additional material facts that he contends are in dispute, "he . . . [wa]s required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs."  *Johnson v. City of Troy*, 14-CV-0817, 2016 WL 5107124, at *8 n.12 (N.D.N.Y. Sept. 20, 2016) (Suddaby, C.J.).

Second (and relatedly), there are several instances in which Plaintiff purports to "[d]ispute" a fact not actually asserted–or, in certain instances, merely *implied*–by the movant's Rule 7.1 Statement.  (*See, e.g.,* Dkt. No. 30 at ¶¶ 9, 69-71, 81-82 118-19, 120 [Plf's Rule 7.1 Response to Union].)  Purported denials of facts not expressly asserted (or of those merely implied) are insufficient to create a genuine dispute with respect to the fact that a movant actually asserts.  *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the

summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *cf. Baity*, 51 F. Supp. 3d at 418.  The Court notes that a party denying a fact asserted must (a) expressly state that all or part of a fact is denied, and (b) if part of a factual assertion is disputed, specify *which* part of the assertion is denied.  N.D.N.Y. L.R. 7.1(a)(3).

Third, there are several instances in which Plaintiff purports to "[d]ispute" a fact asserted on the basis that he "does not remember" or "does not recall" the accuracy or truth of the fact asserted.  (*See, e.g.,* Dkt. No. 30 at ¶¶ 125-26, 188-89 [Plf.'s Rule 7.1 Response to Union].)  As the Second Circuit has observed, "vague denials and memory lapses . . . do not create genuine issues of material fact."  *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000); *accord, Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order).  Accordingly, any properly supported factual assertion to which Plaintiff responds by asserting only that he does not remember the accuracy or truth of the fact asserted will be deemed admitted.

Fourth, and finally, there are a handful of instances in which Plaintiff has "[d]isputed" a factual assertion by either (a) citing to record evidence generally and without providing a specific or pinpoint citation to the portion of the record evidence where the purported dispute arises, or (b) not citing the record at all.  (*See, e.g.,* Dkt. No. 30 at ¶¶ 9, 40 [Plf.'s Rule 7.1 Response to Union].)  Local Rule 7.1(a)(3) of the Court's Local Rules of Practice requires litigants to provide a "*specific* citation to the record where the factual issue arises."  N.D.N.Y. L.R. 7.1(a)(3) (emphasis added).[1]

---

[1]        *See, e.g., Rizzo v. Health Research, Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson*

### 1. Undisputed Material Facts on Local 687's Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Local 687 in its Rule 7.1 Statement and expressly admitted by Plaintiff in his Rule 7.1 Response. (*Compare* Dkt. No. 20, Attach. 2 [Union's Rule 7.1 Statement] *with* Dkt. No. 30 [Plf.'s Rule 7.1 Response to Union].)

#### General Background Regarding Plaintiff's Employment and Union Membership

1. Plaintiff was employed by UPS from March 1990 until September 2015.

2. While employed by UPS, Plaintiff held both part-time and full-time positions, including loader and package driver; and, at all relevant times, Plaintiff was a member of the International Brotherhood of Teamsters ("IBT") and Local 687, an IBT-affiliated local union.

3. Plaintiff began his career with UPS in New York City, where he worked from 1990 to 1994 and was a member of IBT, Local 804.

4. In or around l994, Plaintiff relocated and became a member of Local 687 in Potsdam, New York.

---

*v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at *1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Janneh v. Regal Entm't*, 07-CV-0079, 2009 WL 2922830, at *1, n.3 (N.D.N.Y. Sept. 8, 2009) ("In response . . . Janneh filed a 'Statement of Material Facts Not in Dispute.' . . . The document consists of . . . a phrase at the end of the document stating simply: 'See Attached Exhibits.' Janneh's statement fails to comply with the Local Rules which Janneh has repeatedly been advised about . . . ."); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at *2, n.6 (S.D.N.Y. Oct. 17, 2000) ("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts. . . . [A] vague cite to all of the exhibits is simply unacceptable.").

5.      At all times relevant in 2015, Plaintiff worked as a package driver, operating primarily from the UPS Potsdam Warehouse Center in Potsdam, New York ("Potsdam Center").

6.      In 2015, Plaintiff met with a Teamster Benefit Fund representative who informed Plaintiff that he was eligible for retiree health insurance coverage.

7.      To be eligible for retiree health insurance, an employee must be employed by UPS for at least 25 years.

8.      Plaintiff worked for UPS as a member of Teamsters Local Union 804 for four years and as a member of Local 687 for 21 years.

9.      As discussed in greater detail below, soon after acquiring retiree health insurance eligibility, Plaintiff engaged in behaviors resulting in a series of UPS disciplinary actions.[2]

10.     UPS is the world's largest package delivery company and a leading provider of specialized transportation and logistic services.

11.     UPS employs roughly 250 individuals who work in three distribution centers in Upstate New York and who are represented for collective bargaining purposes by Local 687.

12.     Prior to February 2015, Robert Milne ("Milne") served as the UPS Business Manager at the Potsdam Center.

13.     In or around February 2015, Milne became the On-Road Supervisor for the Potsdam Center.  In this capacity, Milne became Plaintiff's immediate supervisor.

_____

[2]      (*Compare* Dkt. No. 20, Attach. 2, at ¶ 9 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 9 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" a fact not asserted by Local 687 (i.e., that a "correlation" existed "between . . . retirement health insurance eligibility and the disputed disciplinary actions taken by UPS,") and, in any event, failing to cite record evidence giving rise to a factual dispute].)

14.     As his immediate supervisor, Milne had frequent, work-related contact with Plaintiff.

15.     In February 2015, Joelle Sebastian-Dean ("Sebastian-Dean") was appointed as the Potsdam Center's Business Manager.

16.     Although Sebastian-Dean effectively replaced Milne, Milne remained employed at the Potsdam Center as the On-Road Supervisor.

17.     As Business Manager, Sebastian-Dean oversaw all aspects of the Potsdam Center, including the loading of "package cars" in the morning, the on-road workday, and night pickup operations.

18.     Prior to Sebastian-Dean's assignment, the Potsdam Center "was not making their numbers in safety, service, production [and] cost."[3]

19.     Upon her arrival, Sebastian-Dean focused on ensuring that UPS employment policies were implemented correctly and consistently; in other words, she did not "let things slide."[4]

20.     In pursuit of this goal, Sebastian-Dean began holding employees accountable for violations of UPS safety and service policies.

21.     Brian Speller ("Speller") is employed by UPS as a Labor Supervisor, a position he has held since 2007.

22.     Speller's responsibilities include recommending disciplinary suspensions and discharges to the UPS District Labor Manager.

---

[3]     (Dkt. No. 21, Attach. 5, at 49 [Sebastian-Dean Depo. Tr.].)

[4]     (Dkt. No. 21, Attach. 6, at 14 [Perry Depo. Tr.].)

23.     At various times in 2015, Speller recommended to the District Labor Manager that Plaintiff be suspended and, ultimately, discharged.

## General Background Regarding Local 687

24.     Local 687 is an unincorporated trade union, with its principle office at 214 Elm Street, Potsdam, New York.

25.     Local 687 is an affiliate of the IBT.  In conjunction with the Teamsters United Parcel Service National Negotiating Committee, it is a party to the CBA, which governs the terms and conditions of employment for UPS employees in Upstate New York.

26.     The CBA was effective on August 1, 2013, and ends on July 31, 2018.

27.     Local 687 has approximately 1,350 members who work under more than 120 collective bargaining agreements with various employers throughout Upstate New York.

28.     At all times relevant in 2015, Brian K. Hammond ("Hammond") was Local 687's Principal Executive Officer and an elected Business Agent.

29.     Hammond has served as a Local 687 Business Agent since approximately February 2001.

30.     Before serving as a Business Agent for the Local 687, Hammond worked for UPS as a delivery driver.

31.     Hammond regularly represents UPS delivery drivers with respect to negotiations, dispute resolution, grievances, and arbitrations.

32.     One of Hammond's primary duties consists of discerning which employee grievances have merit and which do not.

33.     Local 687 does not require its Business Agents to process all grievances to arbitration.

34.     When a dispute is reduced to a written grievance, the grievance becomes the property of Local 687.

35.     Local 687 determines whether or not to take the grievance to arbitration or some other dispute-resolution process.

36.     Hammond first handled a grievance for Plaintiff in 2003, after Plaintiff was involved in a workplace violence and harassment charge.

37.     Hammond was successful in having the charge dropped.

38.     In 2008, Hammond successfully handled another disciplinary grievance for Plaintiff.

39.     In an average year, about "a couple hundred" grievances are filed by or on behalf of Local 687 members.

40.     Many more work-related issues are resolved without the involved parties ever filing a grievance.[5]

---

[5]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 40 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 40 [Plf.'s Rule 7.1 Response to Union, denying above-stated fact as "[t]aken out of context," but failing to cite record evidence giving rise to a factual dispute].)  The Court notes that "[t]he materiality of an assertion of fact on a motion for summary judgment is a legal conclusion to be made by the Court." *Zhao-Royo v. New York State Educ. Dep't*, 14-CV-0935, 2017 WL 149981, at *2, n.2 (N.D.N.Y. Jan. 13, 2017); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material.").  "As a result, where a non-movant has merely objected to the materiality of a fact, and the Court has concluded that the fact is material, the fact will be deemed admitted."  *Zhao-Royo*, 2017 WL 149981, at *2, n.2; *see also Newmark v. Lawrence Hosp. Ctr.*, 07-CV-2861, 2008 WL 5054731, at *8, n.7 (S.D.N.Y. Oct. 20, 2008) (finding two material facts admitted where the non-movant merely objected to the materiality of the facts).

41.     Union Steward Kirk Perry ("Perry") worked for UPS as a delivery driver and served as Union Steward for periods during the 1980s, 1990s, and for an additional two or three years immediately prior to his retirement in February 2016.

42.     Throughout 2015, Perry served as Union Steward at the Potsdam Center.

43.     As a Union Steward, Perry's responsibilities included handling members' grievances and discussing grievances with management.

44.     If unable to resolve a dispute, Perry would relay the information to a Local 687 Business Agent, such as Hammond.

45.     Tom Phillips ("Phillips") is a Local 687 member employed by UPS as a mechanic at the Potsdam Center.

46.     Phillips has served as a Local 687 Union Steward for the night shifts.

47.     In addition to Perry, Plaintiff related some of his 2015 grievances to Phillips.

**The CBA**

48.     UPS and various local unions affiliated with the IBT, including Local 687, are parties to a National Master Agreement, governing the terms and conditions of employment of bargaining unit members.

49.     The National Master Agreement is supplemented by the Upstate/Western New York and United Parcel Service Rider ("Rider").[6]

50.     Articles 7, 46, and 58 of the CBA set forth the exclusive procedure for handling employee grievances with UPS at the local level.

---

[6]     Unless otherwise noted, the Court uses the term "CBA" to refer generally to both the National Master Agreement and the Rider.

51.     When an employee wants to grieve a particular action or omission, he or she must file a grievance with the Union and UPS within 10 days of the date of that action or omission.

52.     Local 687 has discretion as to whether to pursue a grievance to arbitration.

53.     Article 7 of the CBA states that, "[e]xcept in cases involving cardinal infractions under the applicable Supplement, Rider or Addendum, an employee to be discharged or suspended shall be allowed to remain on the job, without loss of pay unless and until the discharge or suspension is sustained under the grievance procedure."[7]

54.     Article 7 of the CBA allows an employee to continue working until a disciplinary action has been resolved by the Union and UPS.

55.     Pursuant to Article 58 of the CBA, UPS "shall not discharge nor suspend any employee without just cause."[8]

56.     Article 58 of the CBA outlines the process that UPS must follow in rendering a suspension or discharge.

57.     Article 46 of the CBA establishes a procedure for final and binding arbitration when a disciplinary grievance cannot be resolved by the Union and UPS.

58.     The Union and UPS participate in the Upstate/Western New York Supplemental Panel Committee ("the arbitration panel"), which adjudicates all discharge and suspension grievances.

59.     The arbitration panel is comprised of two Co-Chairs from IBT locals other than the one impacted, two Co-Chairs representing UPS, and a paid Arbitrator who serves as the neutral decision-maker.

_____

[7]      (Dkt. No. 20, Attach. 5, at 20 [CBA, Art. 7].)

[8]      (Dkt. No. 20, Attach. 5, at 202 [CBA, Art. 58, § A].)

60.     If an employee has been issued a working suspension or discharge under Article 7 of the CBA, he or she can continue working for UPS until the arbitration panel issues its decision.

61.     At any time prior to the arbitration panel's decision, the parties can agree on a resolution, such as (for example) a time-served suspension in lieu of a discharge.

62.     During arbitration panel proceedings, both the Union and UPS are permitted to submit written briefs articulating their respective positions on the matter at issue, as well as documentary evidence.  Moreover, the grievant is permitted to testify.

63.     It is highly unusual for anyone other than the grievant to testify before the arbitration panel.

64.     Lawyers are not allowed to appear on behalf of the Union, UPS, or the grievant during the arbitration panel process.

65.     Both the Union and UPS are allowed only one adjournment as of right in the arbitration process.

66.     Any adjournment other than the one received as of right must be granted by the arbitration panel, which retains exclusive discretion in this regard.

67.     There are no appeals from an arbitration panel determination.

### March 3, 2015–Plaintiff's Conduct, Discipline, and Grievances

68.     On March 3, 2015, Plaintiff was assigned to deliver several packages to a customer, Marlene Chapple ("Chapple"), whose business was located at 812 Proctor Street, Ogdensburg, New York.

69.     Upon arriving at the address, Plaintiff concluded that Chapple's loading dock was wet and icy and, therefore, that the conditions were unsafe.[9]

70.     After Plaintiff delivered the packages, Chapple contacted the Potsdam Center and expressed her dissatisfaction with the handling of the packages, as well as what she described as Plaintiff's "unprofessional" conduct.[10]

71.     Chapple asserted that Plaintiff confronted her, threw the packages on the loading dock, and refused to stack the packages properly.[11]

72.     Plaintiff disagreed with Chapple's version of events.

73.     UPS conducted an investigation of the incident.

74.     During the investigation, UPS interviewed both Chapple and Plaintiff.

75.     Chapple submitted pictures of the packages strewn on the loading dock.[12]

---

[9]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 69 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 69 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting additional facts (i.e., that another witness testified about the condition of the dock at issue), but failing to clarify what portion of the fact asserted he actually "[d]ispute[s]" and to cite record evidence giving rise to a factual dispute].)

[10]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 70 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 70 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" a fact not asserted by the Union (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[11]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 71 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 71 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" a fact not asserted by the Union (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[12]     (Dkt. No. 21, Attach. 5, at 137 [Sebastian-Dean Depo. Tr.].)  The parties agree that the packages fell off of a pallet and onto the dock, but they dispute whether Plaintiff or the customer caused the packages to fall.  (*Compare* Dkt. No. 20, Attach. 2, at ¶ 75 [Union's Rule 7.1 Statement] *with* Dkt. No. 30 at ¶ 75 [Plf.'s Rule 7.1 Response to Union].)

76.     Plaintiff also provided UPS with pictures of the loading dock.

77.     Milne went to the Chapple's business to determine the condition of the loading dock.

78.     In addition to the incident with Chapple, on March 3, 2015, Plaintiff told Milne that he was experiencing numbness in his toes, which had purportedly started two weeks earlier while Plaintiff was driving.  Milne reported this as a violation of UPS policy and Article 18 of the CBA, which states that "[a]ny employee involved in any accident shall immediately notify the Employer."  Because the numbness happened while Plaintiff was driving, Milne considered it a work-related accident.

79.     On March 3, 2015, after Plaintiff completed his route, a meeting was held at the Potsdam Center to address the customer complaint investigation, as well as whether Plaintiff had failed to timely report a work-related injury.

80.     Plaintiff, Phillips, and Milne were present at the meeting.

81.     At the meeting, Milne asserted that, based on the investigation, even if the loading dock was wet and/or icy, there were other means by which Plaintiff could have unloaded the packages without damage.[13]

82.     Specifically, Milne determined that, even if Plaintiff could not move directly from the truck to the loading dock, he could have gone through a pedestrian door to reach the dock

---

[13]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 81 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 81 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" a fact not asserted by the Union (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)

and place the packages in an appropriate and orderly fashion.[14]

83.     Based on its investigation, UPS concluded that Plaintiff changed his story of what transpired several times, and that the photographic evidence showed that the packages were not placed properly.[15]

84.     Sebastian-Dean conveyed these findings to Speller, who concluded that Plaintiff should be disciplined.[16]

85.     Thereafter, Sebastian-Dean wrote two letters to Plaintiff, both dated March 5, 2015, informing him of the charges against him and the related discipline.[17]

86.     One of the letters was a warning notice concerning Plaintiff's failure to report his "injury;" and the other letter informed Plaintiff that UPS was imposing a one-day working suspension in relation to Chapple's complaint about Plaintiff's delivery.

---

[14]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 82 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 82 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" a fact not asserted by the Union (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[15]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 83 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 83 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" a fact not asserted by the Union (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord*, Dkt. No. 21, Attach, 5, at 135 [Sebastian-Dean Depo. Tr.].)

[16]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 84 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 84 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact "[t]o the extent that Plaintiff is without knowledge as to the operation of Speller's mind," but failing to cite record evidence giving rise to a factual dispute].)

[17]     (Dkt. No. 20, Attachs. 8-9 [Letters to Plf., dated 3/5/2015]; *accord*, Dkt. No. 21, Attach. 1, at 48 [Plf.'s Depo. Tr.].)  Plaintiff disputes the fact asserted to the extent that it is "[u]nknown" when Sebastian-Dean actually "addressed" the letters, but does not dispute that he actually received the letters or that they are dated March 5, 2015.  (Dkt. No. 30 at ¶ 85.)

87.     Plaintiff received these letters.

88.     Nearly two weeks later, on March 18, 2015, Plaintiff e-mailed Hammond and expressed his belief that "UPS has 72 hours to put you on notice that they are going to take action and once they put you on notice they have 10 days to take action . . . this is now greater than two weeks and I'm still not suspended."[18]

89.     Hammond responded, "I was told by Mr. Speller that it is an Article 7 suspension[.]"[19]

90.     Plaintiff again inquired, "Am I suspended or not.  Joelle [Sebastian-Dean] told you no.  Today I finally received letters."[20]

91.     At some point in March 2015, Plaintiff obtained a copy of a Local 687 grievance form.

92.     Plaintiff hand-wrote a grievance, contesting the one-day suspension.[21]

93.     The grievance asserted that UPS violated Article 7 of the CBA by issuing disciplinary action against him.

94.     More specifically, the grievance, later denominated as Case No. 20-15, asserted that Plaintiff "follow[s] methods everyday, as [he has] been trained."[22]

95.     On March 19, 2015, Plaintiff filed another grievance, again contesting the March 3, 2015, suspension.[23]

---

[18]     (Dkt. No. 20, Attach. 10.)

[19]     (*Id.*)

[20]     (*Id.*)

[21]     (Dkt. No. 20, Attach. 11 [grievance form, dated 3/18/15].)

[22]     (*Id.*)

[23]     (Dkt. No. 20, Attach. 12 [grievance form, dated 3/19/15].)

96.     The second grievance described the UPS's warning letter and suspension notice as "inappropriate" and "too vague."[24]

97.     Upon submission, the grievances became the property of Local 687, which had the responsibility of determining whether the grievances had sufficient merit to warrant further processing.

### Plaintiff's Violations of the UPS Policy Related to Shift Length, Discipline, and Grievances

98.     As a matter of unwritten policy, Sebastian-Dean required each driver to call his or her supervisor if the delivery route that he or she was servicing was going to exceed 9.5 hours of work that day ("the 9.5 policy").[25]

99.     Before Sebastian-Dean issued this requirement, drivers could notify management if their workday was going to exceed 9.5 hours by using UPS's Delivery Information Acquisition Device ("DIAD"), a handheld device that allows drivers to (among other things) scan packages and relay communications.

---

[24]     (*Id.*)

[25]     (Dkt. No. 21, Attach. 5, at 64-68 [Sebastian-Dean Depo. Tr.].)  The Union asserts that the 9.5 policy "derives from" Article 37 of the CBA, which states, in part, that "[t]he Employer shall make a reasonable effort to reduce package car driers' workdays below nine and one half (9.5) hours per day where requested."  (Dkt. No. 20, Attach. 5, at 129 [CBA]; *see also* Dkt. No. 20, Attach. 2, at ¶ 98 [Union's Rule 7.1 Statement].)  Plaintiff disputes this assertion, based upon Sebastian-Dean's deposition testimony that her "primary reason for implementing" the 9.5 policy was that UPS's "drivers were getting back at all different various times of the night," resulting in "pickup packages not getting on feeder" trucks in time for delivery service. (Dkt. No. 21, Attach. 5, at 65; *see also* Dkt. No. 30 at ¶¶ 98-99 [Plf.'s Rule 7.1 Response to Union].)  Although Sebastian-Dean testified that "[t]here were several purposes" behind the 9.5 policy, Plaintiff's point is well taken.  In any event, the parties do not dispute the existence or substance of Sebastian-Dean's 9.5 policy.

100. Even after the requirement of strict compliance with the 9.5 policy was communicated to drivers, Sebastian-Dean recognized that several drivers were still failing to comply with it.

101. On April 2, 2015, four drivers at the Potsdam Center were called to a meeting to address 9.5 policy compliance. Plaintiff was among this group of drivers.

102. Plaintiff and UPS drivers Jeff Stone, Bill Barrett and Al Goodwin attended the meeting, along with Perry and Milne.

103. At the meeting, UPS took disciplinary action against Plaintiff for violating the 9.5 policy.[26]

104. On April 3, 2015, Sebastian-Dean sent a letter to Plaintiff.

105. The letter advised Plaintiff that UPS was imposing a three-day working suspension for his violation of the 9.5 policy.

106. On April 7, 2015, Sebastian-Dean reviewed the UPS automated delivery record system, which showed that, on April 6, 2015, Plaintiff again failed to comply with the 9.5 policy.[27]

---

[26]        (Dkt. No. 21, Attach. 1, at 291-92 [Plf.'s Depo. Tr.].)  The Union asserts that, at the same meeting, UPS also took disciplinary action against UPS drivers Stone, Barrett, and Goodwin for violating the 9.5 policy.  (Dkt. No. 20, Attach. 2, at ¶¶ 103-04 [Union's Rule 7.1 Statement].)  However, the Union's record citation in support of this assertion–to Plaintiff's deposition testimony–does not support it.  (Dkt. No. 21, Attach. 2, at 291 [Plf.'s Depo. Tr., during which Plaintiff testified, "I don't remember who was issued suspensions or disciplines and what they were about.  I just remember the presence of them"].)  However, Plaintiff also testified that "[o]ne of the people in there . . . I was aware . . . was in that room for the same reason I was."  (Dkt. No. 21, Attach. 2, at 302.)  The Court notes that Sebastian-Dean testified during her deposition that "Bill Barrett, Al Goodwin, Dave Rivera, [and] Jeremy Shatraw" were also disciplined for violating the 9.5 policy, although it is unclear if this occurred at the same meeting.  (Dkt. No. 21, Attach. 5, at 110 [Sebastian-Dean Depo Tr.].)

[27]        (*Compare* Dkt. No. 20, Attach. 2, at ¶ 107 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 107 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)

107.     Sebastian-Dean's review was triggered by Plaintiff's "paid over" status, indicating that he worked more hours than he was allowed to work.[28]

108.     On April 7, 2015, Sebastian-Dean sent another letter to Plaintiff.

109.     The letter informed Plaintiff that UPS was imposing a five-day working suspension for his "failure to follow proper delivery methods, procedures and instructions, regarding proper communication with [the] center team."

110.     On April 8, 2015, Plaintiff filed a handwritten grievance, later denominated Case No. 22-15.

111.     The grievance asserted "[o]n Thursday, April 2, I was issued a three-day suspension for not communicating I would be over 9.5 hours.  I did communicate this as usual . . . ."[29]

112.     Plaintiff protested UPS's imposition of discipline for not contacting Milne to report that he would be working more than 9.5 hours.

113.     Plaintiff discussed his grievances with Hammond and Perry.

114.     On April 10, 2015, Plaintiff filed another grievance, in which he asserted that he was told by Sebastian-Dean to take a meal break outside of an "appropriate time window."[30]

115.     On April 17, 2015, a disciplinary meeting was held at the Potsdam Center to address Plaintiff's violations of the 9.5 policy.

---

[28]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 108 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 108 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact "to the extent set forth" in paragraph 107 of his Rule 7.1 Response, but failing to cite record evidence giving rise to a factual dispute].)

[29]     (Dkt. No. 20, Attach. 15 [grievance form, dated 4/8/15].)

[30]     (Dkt. No. 20, Attach. 16 [grievance for, dated 4/10/15].)

116.     In addition to the 9.5 policy violations, the meeting also addressed the issue of whether Plaintiff was failing to register stops correctly in his DIAD.

117.     Prior to this meeting, Hammond called Speller regarding the pending disciplinary charges against Plaintiff.[31]

118.     Hammond asked Speller whether Plaintiff could "come back on a time served suspension."[32]

119.     Speller replied that "we'll have to meet on the 17th and see what comes of that meeting."[33]

120.     On April 17, 2015, Plaintiff attended the meeting with Hammond, Perry, Speller, Sebastian-Dean, and District Labor Manager Jim Dolan.

121.     At the meeting, Speller addressed whether Plaintiff failed to follow UPS methods, procedures, and instructions.

---

[31]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 118 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 118 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting additional facts (including that Hammond never *told* Plaintiff that he discussed the pending charges with Speller), but failing to cite record evidence giving rise to a factual dispute].)

[32]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 119 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 119 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting additional facts (including that Hammond never *told* Plaintiff that he discussed the pending charges with Speller), but failing to cite record evidence giving rise to a factual dispute].)

[33]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 120 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 120 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting additional facts (including that Hammond never *told* Plaintiff that he discussed the pending charges with Speller), but failing to cite record evidence giving rise to a factual dispute].)

122.	Hammond and Perry represented Plaintiff at the meeting.

123.	The Union presented evidence in an effort to support Plaintiff's position that he properly recorded his package deliveries in the DIAD and in the manner in which he had been trained.[34]

124.	Because the meeting addressed Plaintiff's accumulated disciplinary charges, the Union presented evidence related to Plaintiff's March 3, April 2, and April 7, 2015, suspensions as well.[35]

125.	For example, Hammond, who had prior, personal experience with the individual involved in the customer complaint (Chapple) from his days at a driver, argued that Chapple was "a pretty hard person to get along with."[36]

---

[34]	(*Compare* Dkt. No. 20, Attach. 2, at ¶ 125 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 125 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact based on his assertion, in his declaration filed in opposition to Defendants' respective motions, that he "does not remember Hammond or any other UNION official saying anything in [his] defense" at the meeting].)  As the Second Circuit has observed, "vague denials and memory lapses . . . do not create genuine issues of material fact."  *F.D.I.C.*, 205 F.3d at 75.

[35]	(*Compare* Dkt. No. 20, Attach. 2, at ¶ 126 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 126 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact based on his assertion, in his declaration filed in opposition to Defendants' respective motions, that he "does not remember Hammond or any other UNION official saying anything in [his] defense" at the meeting].)  *See also, supra,* note 34 of this Decision and Order.

[36]	(*Compare* Dkt. No. 20, Attach. 2, at ¶ 127 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 127 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact based on his assertion, in his declaration filed in opposition to Defendants' respective motions, that he "does not remember Hammond or any other UNION official saying anything in [his] defense" at the meeting].)  *See also, supra,* note 34 of this Decision and Order.

126.    Hammond proposed alternatives to Plaintiff's discharge.[37]

127.    At the conclusion of the meeting, UPS believed that discharging Plaintiff was appropriate discipline.

128.    Sometime shortly after the meeting, Plaintiff contacted his doctor about going on medical leave for a back injury. As a result, Plaintiff did not return to work until May 22, 2015.

129.    On April 20, 2015, Sebastian-Dean sent a letter to Plaintiff.

130.    The letter stated, "This is an Official Discharge Notice as outlined in the current labor agreement between UPS and I.B.T. Local 687." The basis for Plaintiff's discharge was his failure to "follow proper delivery methods, procedure and instructions."[38]

131.    Despite being issued a working discharge for improperly sheeting packages, Plaintiff did not change his behavior. He testified during his deposition, "I had been instructed to record the packages exactly how I recorded them after April 17."[39]

## The Union's Pursuit of Plaintiff's Four Grievances to Final Arbitration

132.    In 2015, out of approximately 120 grievances filed by Local 687 members against UPS, only six cases involving discipline were brought before the arbitration panel.

---

[37]    (*Compare* Dkt. No. 20, Attach. 2, at ¶ 128 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 128 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact based on his assertion, in his declaration filed in opposition to Defendants' respective motions, that he "does not remember Hammond or any other UNION official saying anything in [his] defense" at the meeting].) *See also, supra,* note 34 of this Decision and Order.

[38]    (Dkt. No. 20, Attach. 17 [Letter to Plf., dated 4/20/15].) This discharge was the basis for Plaintiff's grievance in Case No. 23-15. (Dkt. No. 20, Attach. 2, at 16 n.10.)

[39]    (Dkt. No. 21, Attach. 2, at 332 [Plf.'s Depo. Tr.].) During his deposition, Plaintiff answered "No" when asked, "Did the fact that you were discharged for sheeting a package a certain way, even if you disagree with it, did it strike you that maybe you ought to change how you sheet packages in similar circumstances?" (*Id.* at 331-32.) Plaintiff testified, "I assumed that the company was going to fire me for anything they felt like firing me for." (*Id.* at 332.)

133. Four of the six grievances that were presented to the arbitration panel involved discipline issued against Plaintiff.

134. In 2015, Plaintiff filed nearly a dozen grievances with Local 687 against UPS.

135. Many of the grievances stemmed from the same or similar underlying events, and were consolidated into four distinct cases that were presented to the arbitration panel concurrently.

136. The first case–Case No. 20-15–concerned Chapple's complaint on March 3, 2015, about Plaintiff's allegedly unprofessional conduct while making a delivery. As noted above, this complaint resulted in UPS issuing a one-day suspension to Plaintiff.[40]

137. The second case–Case No. 21-15–concerned the accusations that Plaintiff "fail[ed] to follow proper delivery methods, procedures and instructions regarding proper communication with the center team," by not calling his supervisor (Milne) to report that his shift would exceed 9.5 hours.[41]

138. The third case–Case No. 22-15–also resulted from Plaintiff's alleged violations of the 9.5 policy.[42]

139. The fourth and final case to proceed to arbitration–Case No. 23-15–concerned an allegation first presented to Plaintiff at the April 17, 2015, disciplinary meeting. More specifically, as noted above, Plaintiff was informed that he improperly registered his package deliveries in his DIAD (a process colloquially known as "sheeting").[43]

---

[40]     (Dkt. No. 20, Attach. 18 [Case No. 20-15 Union Brief].)

[41]     (Dkt. No. 20, Attach. 19 [Case No. 21-15 Union Brief].)

[42]     (Dkt. No. 20, Attach. 20 [Case No. 22-15 Union Brief].)

[43]     (Dkt. No. 20, Attach. 21 [Case No. 23-15 Union Brief].)

140.    The Union prevailed (at least in part) before the Panel in Case Nos. 20-15 and

21-15.  Plaintiff's suspension (from March 3, 2015) was reduced to a warning, and Plaintiff's

three-day suspension (from April 7, 2015) was reduced to a one-day suspension.

141.    The arbitration panel upheld the five-day suspension imposed in Case No. 22-15

and the discharge imposed in Case No. 23-15.[44]

142.    As a result of the discharge holding in Case No. 23-15, Plaintiff's employment

with UPS ended on September 16, 2015.

### Plaintiff's Disagreements with the Union's Presentations to the Panel

143.    Shortly after the April 17, 2015, meeting, the Union evaluated the merits of

Plaintiff's grievances and decided to present Plaintiff's four-discipline case to the arbitration

panel.[45]

144.    Although UPS conveyed its intent to discharge Plaintiff, UPS's action was taken

pursuant to Article 7 of the CBA, which allowed Plaintiff to continue working pending a final

---

[44]    (Dkt. No. 20, Attachs. 24, 25.)  Although Plaintiff disputes the Union's assertion that the discipline imposed in Case Nos. 22-15 and 23-15 was upheld "[n]otwithstanding [its] best efforts," the parties do not appear to dispute–and the record establishes–that the discipline with respect to these grievances was, in fact, upheld (and not reduced, vacated, or otherwise altered).  (*Compare* Dkt. No. 20, Attach. 2, at ¶ 143 [Union's Rule 7.1 Statement] *with* Dkt. No. 30 at ¶ 143 [Plf.'s Rule 7.1 Response to Union].)

[45]    (*Compare* Dkt. No. 20, Attach. 2, at ¶ 145 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 145 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact "to the extent set forth in No. 143," but failing to cite record evidence giving rise to a factual dispute].)  Paragraph 143 of Plaintiff's Rule 7.1 Response contains numerous legal arguments, including that the Union "breached its duty of fair representation" and "refused to consider substantive arguments" that, if made to the arbitration panel, would have "permitted [him] to prevail" and "save[d] his job."  (Dkt. No. 30 at ¶ 143 [Plf.'s Rule 7.1 Response].)  As discussed above, such legal arguments are insufficient to create a genuine dispute of material fact.

decision by the arbitration panel.[46]

145.    Local 687 docketed the grievance cases for an arbitration panel hearing to be held in May 2015.

146.    The Union asserted that, because all of the disciplinary actions taken were pursuant to Article 7, and thus were not cardinal infractions, UPS did not have grounds to discharge Plaintiff.[47]

147.    Plaintiff wanted to argue that UPS had repeatedly directed him to engage in unethical behavior and that he was being subjected to retaliation for making complaints about UPS working conditions to OSHA.

148.    On April 23, 2015, Plaintiff sent an e-mail to Hammond, in which he asserted that he possessed several messages from UPS asking him to participate in "unethical" and "dishonest" acts.[48]

149.    In the same e-mail thread, Hammond responded, "Good get them together and e-mail them if you can and I can print them in color[.]"[49]

---

[46]    (*Compare* Dkt. No. 20, Attach. 2, at ¶ 146 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 146 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact, but failing to cite record evidence giving rise to a factual dispute].)

[47]    (*Compare* Dkt. No. 20, Attach. 2, at ¶ 148 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 148 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact, but failing to cite record evidence giving rise to a factual dispute].)

[48]    (Dkt. No. 20, Attach. 26.)

[49]    (*Id.*)

150.    Plaintiff responded, "The company is the one with the integrity problem not me [*sic*] or the people I work with Brian. . . . You need to know that I'm not lying."[50]

151.    Shortly after this e-mail exchange, Hammond's wife required surgery, causing him to be out of the office for several days.

152.    On April 29, 2015, Plaintiff attempted to contact Hammond to arrange a meeting.

153.    Although Hammond was out of the office due to his wife's surgery, he responded promptly, "Can't talk at hospital with wife call you back later[.]"[51]

154.    Plaintiff replied that he "hop[ed Hammond's] wife [wa]s ok," and reiterated that he "really need[ed] to talk."[52]

155.    Hammond responded within minutes and suggested that Plaintiff meet him at Hammond's office on Friday, May 1, 2015.[53]

156.    Plaintiff did not respond to Hammond's e-mail proposing a meeting on May 1, 2015.[54]

157.    Plaintiff did not meet with Hammond on May 1, 2015.[55]

---

[50]    (*Id.*)

[51]    (*Id.*)

[52]    (*Id.*)

[53]    (*Id.*)

[54]    (*Compare* Dkt. No. 20, Attach. 2, at ¶ 158 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 158 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" fact asserted and asserting additional fact (i.e., that he "was only permitted to meet with [Hammond] on one (1) occassion"), but failing to cite record evidence giving rise to a factual dispute].)

[55]    (*Compare* Dkt. No. 20, Attach. 2, at ¶ 159 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 159 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting additional facts (e.g., that Hammond "rarely returned [his] phone calls"), but failing to cite record evidence giving rise to a factual dispute].)

158. On May 8, 2015, Plaintiff e-mailed Hammond again and demanded that they meet.

159. During the month of May 2015, Hammond was traveling for Union business, including to Oswego, Buffalo, and Plattsburgh, New York.[56]

160. Hammond had only eight scheduled office days in May 2015 on which he was available to meet with Plaintiff.[57]

161. The only dates on which Hammond was available to meet with Plaintiff in May 2015 (other than May 1, 2015, the date proposed by Hammond) were May 4, 7, 8, 18, 22, 25, and 28.[58]

162. Hammond and Plaintiff did not meet on any of these dates.

163. On Friday, May 22, 2015, after having been medically cleared to return to work by his doctor, Plaintiff ended his medical leave and returned to work.

---

[56] (*Compare* Dkt. No. 20, Attach. 2, at ¶ 161 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 161 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting additional facts (e.g., that Hammond "was physically present at Local 687's Potsdam offices once every couple of months"), but failing to cite record evidence giving rise to a factual dispute].)

[57] (*Compare* Dkt. No. 20, Attach. 2, at ¶ 162 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 162 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" fact asserted and asserting additional facts (e.g., that Hammond "was physically present at Local 687's Potsdam offices once every couple of months"), but failing to cite record evidence giving rise to a factual dispute].)

[58] (*Compare* Dkt. No. 20, Attach. 2, at ¶ 163 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 163 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" fact asserted and asserting additional facts (i.e., that Hammond "was physically present at Local 687's Potsdam offices once every couple of months"), but failing to cite record evidence giving rise to a factual dispute].)

164.    This was the only day that Plaintiff worked during the month of May 2015 because, beginning the following week, he was on vacation.

165.    On May 26, 2015 (i.e., four days after returning to work), Plaintiff e-mailed Hammond, demanding that he file a grievance concerning two issues that arose on May 22, 2015.

166.    On the same date, Hammond responded, in part, "It is your right to file grievances [and] it is my job to decide the merit of them."[59]

167.    Moreover, Hammond responded that a grievance for one of the issues raised by Plaintiff was already pending because it had been filed on behalf of other employees.

168.    With respect to a grievance on the other issue raised in Plaintiff's e-mail, Hammond instructed Plaintiff, "Yes you should file if you believe you could have completed everything assigned."[60]

169.    In an e-mail response sent a short time later, Plaintiff not only referred to Hammond's earlier comments and suggestions, but raised yet another employment-related concern, also stemming from May 22, 2015.

170.    Moreover, Plaintiff asserted his belief that UPS was "desperately seeking ways to get rid of [him] since [he] contacted OSHA."[61]

171.    At the time of this e-mail exchange, Hammond was attending an OSHA training session.  In the same e-mail response (referred to in Fact Nos. 169-70, above), Plaintiff asked,

---

[59]    (Dkt. No. 20, Attach. 27.)

[60]    (*Id.*)

[61]    (*Id.*)

"Are you learning in training that we cannot be disciplined for contacting OSHA compliance? Hope so[.]"[62]

### Plaintiff's Behavior After May 22, 2015

172.    On May 29, 2015, despite being on vacation leave, Plaintiff drove his yellow, customized golf cart on the Potsdam Center premises.

173.    Plaintiff's arrival coincided with the time at which all working package drivers were beginning their morning shifts.[63]

174.    Plaintiff drove his golf cart around the perimeter of the UPS building as the drivers were attempting to pull out to commence their work day.[64]

175.    Sebastian-Dean observed Plaintiff "smiling and waving" to the drivers as he drove by in what she characterized as an "extremely unsafe" manner.[65]

---

[62]        (*Id.*)

[63]        (*Compare* Dkt. No. 20, Attach. 2, at ¶ 175 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 175 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" fact asserted and citing record evidence supporting the assertion that he was first observed operating his golf cart "between 9:05 and 9:10 a.m."].)

[64]        (*Compare* Dkt. No. 20, Attach. 2, at ¶ 176 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 176 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" fact asserted and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[65]        (*Compare* Dkt. No. 20, Attach. 2, at ¶ 177 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 177 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute].)

176.     Sebastian-Dean confronted Plaintiff and told him that he was being unsafe.[66]

177.     Several days later, on or around Plaintiff's return from vacation, Sebastian-Dean had a phone conversation with Plaintiff "as to why he was on UPS property on his vacation."[67]

178.     On June 4, 2015, UPS held a disciplinary meeting attended by UPS management personnel, Plaintiff, and Perry (as Plaintiff's representative).  After the meeting, UPS issued Plaintiff a working discharge under Article 7 of the CBA, charging him with creating an unsafe condition when he drove his golf cart on UPS premises.

179.     On June 5, 2015, UPS charged Plaintiff with working 9.77 hours on June 4, 2015, without contacting Milne, in violation of the 9.5 policy.

180.     UPS held another disciplinary meeting with Plaintiff, who was again represented by Perry.  After the meeting, UPS issued Plaintiff another working discharge for violating the 9.5 policy.

181.     At some point thereafter, in June 2015, Plaintiff contacted his doctor, who recommended that he be placed on medical leave.

182.     During this time frame, Plaintiff was also in contact with Hammond, and demanded that Local 687 obtain delivery records from the last day that Plaintiff worked.[68]

---

[66]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 178 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 178 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" fact not asserted by the Union (i.e., that Sebastian-Dean "did not confront Plaintiff *on the date of the incident*)," but failing to cite record evidence giving rise to a factual dispute] [emphasis added].)

[67]     (Dkt. No. 20, Attach. 28.)

[68]     (Dkt. No. 20, Attach. 33 [e-mail from Plaintiff to Hammond, dated 6/1/15, in which Plaintiff wrote, "you need to get my delivery records from the last day I worked.  It's important. . . . I am getting tired of representing myself against this untruthful company"].)

183.    In an e-mail to Hammond, Plaintiff stated that, if Hammond did not get the records at issue, Plaintiff would "take action to get them another way."[69]

184.    In the same e-mail, Plaintiff added an endnote, indicating that he had forwarded a carbon copy ("cc") to the "NLRB" and "NYS division of wage and hour [*sic*]."

185.    On June 4, 2015 (the same date on which UPS issued Plaintiff a working discharge), Plaintiff sent an e-mail to Hammond, criticizing his performance as Local 687's Business Agent.

186.    In June 2015, Hammond contacted Plaintiff for his input with respect to the briefs that he was drafting in support of Plaintiff's cases before the arbitration panel.[70]

187.    Plaintiff responded by verifying the facts set forth in, and suggesting minor changes to, the briefs.[71]

---

[69]    (*Id.*)

[70]    (*Compare* Dkt. No. 20, Attach. 2, at ¶ 188 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 188 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact based on his assertions, contained in his declaration filed in opposition to Defendants' respective motions, that he "was not aware" that the documents sent by Hammond were "the final product . . . submitted to the Panel," and that he "does not remember being allowed an opportunity to review the briefs and to make any desired changes . . . ," but failing to cite record evidence giving rise to a factual dispute].)  *See, supra,* note 34 of this Decision and Order.

[71]    (*Compare* Dkt. No. 20, Attach. 2, at ¶ 189 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 189 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" fact asserted based on his assertions, contained in his declaration filed in opposition to Defendants' respective motions, that he "was not aware" that the documents sent by Hammond were "the final product . . . submitted to the Panel," and that he "does not remember being allowed an opportunity to review the briefs and to make any desired changes . . . ," but failing to cite record evidence giving rise to a factual dispute].)  *See, supra,* note 34 of this Decision and Order.

188.    Plaintiff continued to demand that Local 687 obtain delivery records and testimony from certain UPS drivers in preparation for the arbitration panel hearing, which had yet to be rescheduled.

189.    Moreover, Plaintiff demanded that Local 687 speak to an employee of the business involved in Chapple's complaint from March 3, 2015.

190.    Local 687 obtained records requested by Plaintiff, and Hammond delivered them personally to Plaintiff's home.

## Plaintiff's Final Discharge and Charge Against Local 687 with the U.S. National Labor Relations Board

191.    On June 26, 2015, Plaintiff filed a charge with the U.S. National Labor Relations Board ("NLRB"), alleging that Local 687 committed an unfair labor practice by "restraining" and "coercing" him and "refusing to properly represent him in the matter of his discharge."[72]

192.    On August 3, 2015, Plaintiff's medical leave ended and he returned to work.

193.    On the same date, UPS held another disciplinary meeting with Plaintiff to address allegations that Plaintiff had sheeted deliveries improperly and falsified records.

194.    At the meeting, UPS personnel stated that, because dishonesty and falsification are "cardinal" violations of the CBA, a working discharge was inappropriate.

195.    Plaintiff was issued a final, non-working discharge and removed from UPS's payroll.

196.    On August 5, 2015, the Union filed another grievance on Plaintiff's behalf.

---

[72]    (Dkt. No. 20, Attach. 35 [NLRB Charge].)

197.     This grievance challenged UPS's assertion that Plaintiff was dishonest and falsified records; and, it articulated Plaintiff's belief that management was in "a constant pursuit to discharge" him for, *inter alia*, contacting OSHA.[73]

198.     On the same date, Plaintiff filed a second charge with the NLRB.

199.     The second NLRB charge alleged that the Union "violated its duty of fair representation by ceasing to process" Plaintiff's grievance concerning his April 10, 2015, meal break infraction for "arbitrary and discriminatory reasons."[74]

200.     The NLRB investigator assigned to Plaintiff's unfair labor practice charges against the Union informed Plaintiff that the NLRB would not issue a complaint.

201.     Plaintiff appealed the NLRB's decision not to issue a complaint.

### The Arbitration Panel's Resolution of Plaintiff's Grievances

202.     The arbitration panel was initially scheduled to hear the grievances regarding Plaintiff's discipline (i.e., Case Nos. 20-15, 21-15, 22-15, and 23-15) on a date in May 2015. However, at Plaintiff's request, the arbitration panel postponed the hearing until July 2015.

203.     On June 29, 2015, Hammond sent a letter to Plaintiff, informing him that the Union had used its one postponement as of right and that Plaintiff "will need to be ready at" the new time scheduled for the hearing.[75]

---

[73]     (Dkt. No. 20, Attach. 37 [grievance form, dated 8/5/15].)  The grievance form states, "[p]ositively, I have not committed a cardinal sin.  UPS management has been on a constant pursuit to discharge me since I've contacted OSHA to report safety concerns UPS management neglected to address."  (*Id.*)

[74]     (Dkt. No. 20, Attach. 38 [NLRB Charge, dated 8/5/15].)

[75]     (Dkt. No. 20, Attach. 39.)

204.    Moreover, the letter informed Plaintiff that the Union could request another postponement if the basis was for medical reasons.

205.    Thereafter, UPS requested a postponement of the hearing until September 2015.

206.    On September 4, 2015, Hammond notified Plaintiff that his "suspensions and discharge hearings" were scheduled to be held on September 16, 2015, in Buffalo, New York.[76]

207.    At some point after being notified of the September 2015 arbitration panel hearing, Plaintiff advised Local 687 that he could not attend due to medical reasons and requested another postponement.

208.    On September 11, 2015, Hammond e-mailed Plaintiff regarding his request for a second postponement.

209.    Hammond's e-mail requested that Plaintiff provide documentation demonstrating the need to postpone the hearing, and advised Plaintiff that his request was subject to the approval of the arbitration panel co-chairs.

210.    Moreover, Hammond's e-mail assured Plaintiff that, if he did not submit the requested documentation prior to September 15, 2015, the Union would present the case in his absence.

211.    Plaintiff did not submit the requested medical documentation.

212.    Then, days before the hearing, Plaintiff's personal attorney requested more time so that he could prepare for the hearing.  In response, Local 687 explained that attorneys are not allowed to appear before the arbitration panel and that there was therefore no reason to delay as an accommodation for counsel.

---

[76]    (Dkt. No. 20, Attach. 40.)

213.     The arbitration panel co-chairs refused to further postpone the hearing due to a lack of medical documentation.

214.     Local 687 arranged transportation for Plaintiff to the hearing, offering him a ride with Perry from Plattsburgh, New York, to Buffalo, New York.

215.     At the commencement of the Panel hearing, the neutral arbitrator asked Hammond, "[W]here is your grievant?"

216.     The arbitration panel co-chairs and Hammond contacted Plaintiff via conference call, and asked him for medical documentation.

217.     Plaintiff did not present any documentation.

218.     In any event, the Union presented the case on Plaintiff's behalf and sought his reinstatement.[77]

219.     Hammond presented evidence in support of the Union's argument that Plaintiff should be permitted to return to work and that he did not commit a "cardinal infraction" warranting discharge.[78]

---

[77]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 220 [Union's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 220 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" fact asserted "to the extent" that the Union, *inter alia*, "refus[ed] to consider substantive arguments" that "would have permitted Plaintiff to prevail on the merits of his grievances and save his job," but failing to cite record evidence giving rise to a factual dispute].)

[78]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 221 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 221 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact "to the extent" that the Union, *inter alia*, "conspired with UPS and figuratively threw Plaintiff under the bus, by expressly conceding Plaintiff's wrongdoing/liability," but failing to cite record evidence giving rise to a factual dispute].)

220. Ultimately, the Union was unsuccessful: the Panel upheld Plaintiff's discharge.[79]

## 2. Undisputed Material Facts on UPS's Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by UPS in its Rule 7.1 Statement and expressly admitted by Plaintiff in his Rule 7.1 Response.[80] (*Compare* Dkt. No. 23, Attach. 2 [UPS's Rule 7.1 Statement] *with* Dkt. No. 29 [Plf's Rule 7.1 Response to UPS].)

1. Plaintiff was employed by UPS as a package car driver at its Potsdam, New York, facility, and was represented by Local 687.

2. Plaintiff's employment with UPS was terminated on September 16, 2015.

3. UPS and the Union entered into a CBA that was applicable to the period from August 1, 2013, through July 31, 2018.

4. Because Plaintiff was a member of the Union, his employment was governed primarily by the CBA (and the Rider), as well as the Arbitrator's Rules of Procedure.

### **Plaintiff's Four Grievances**

### **Plaintiff's Altercation with a UPS Customer**

5. On or about March 3, 2015, Plaintiff delivered packages to Chapple at 812 Proctor Avenue, Ogdensburg, New York.

---

[79]     (*Compare* Dkt. No. 20, Attach. 2, at ¶ 222 [Union's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 30 at ¶ 222 [Plf.'s Rule 7.1 Response to Union, purporting to "[d]ispute[]" above-stated fact and asserting legal arguments with respect to the Union's representation of Plaintiff, but failing to cite record evidence giving rise to a factual dispute].)

[80]     Although many of the same incidents and exchanges are at issue in both of the pending motions for summary judgment, the Court has reviewed each Defendant's Rule 7.1 Statements (and Plaintiff's corresponding Rule 7.1 Responses).

6.      During the delivery, Plaintiff unloaded packages from the back of his package car onto a pallet or the loading dock.

7.      Plaintiff then "holler[ed] for someone to help" him with the remaining packages, and eventually unloaded them onto a pallet placed on the dock by Chapple.[81]

8.      Thereafter, the packages fell off of the pallet and onto, or toward, Chapple.[82]

9.      Plaintiff did not assist Chapple with the fallen packages and did not leave his package car.[83]

10.     Plaintiff did not go onto the dock to assist Chapple with the packages being delivered, despite her request that he do so.[84]

11.     Plaintiff did not leave his package car by using the "man-door" to reach the dock and assist Chapple.[85]

---

[81]     (Dkt. No. 21, Attach. 2, at 275 [Plf.'s Depo. Tr.].)

[82]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 8 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 8 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" a fact not asserted by UPS (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[83]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 9 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 9 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" a fact not asserted by UPS (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[84]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 10 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 10 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" a fact not asserted by UPS (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[85]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 11 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶

12.    Plaintiff called his supervisor, Steven Talbot, to report this interaction with

Chapple.

13.    Talbot's notes related to the phone call indicate that he advised Plaintiff to "go

around to the man door, up the stairs and to the dock" to honor Chapple's request that he provide

assistance on the dock.[86]

14.    Plaintiff's manager, Milne, testified during his deposition that he also advised

Plaintiff that he "could use the man-door instead of jumping out from the vehicle to the dock" in

order to assist Chapple with the packages.[87]

15.    On that same date as the delivery, Chapple sent a letter to UPS, complaining that

Plaintiff tossed packages instead of stacking them, and was "discourteous" to her.  She further

attached "pictures of the mess Mr. Carlisle left [her] to deal with."[88]

---

11 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" a fact not asserted by UPS (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute].)  During his deposition, Plaintiff testified that, rather than jumping from the package car to the surface of the dock, he could have "go[ne] through [his] truck, down the steps of [his] cab, around the front of [the] truck, and into the man-door."  (Dkt. No. 21, Attach. 2, at 279 [Plf.'s Depo. Tr.].)  Moreover, Plaintiff testified that he offered to do this, but that Chapple refused and stated, "You are the worst f—— UPS driver I've ever seen.  You get up here right f—— now from the back of your truck.  You are not walking through your truck."  (*Id.* at 279-80.)

[86]         (Dkt. No. 23, Attach. 6, at UPS4987 [Memo from Talbot to Sebastian-Dean, dated 4/7/15].)

[87]         (*Compare* Dkt. No. 23, Attach. 2, at ¶ 14 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 14 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent that" another witness testified about the condition of the dock at issue, but failing to clarify what portion of the fact asserted he actually "[d]ispute[s]" and to cite record evidence giving rise to a factual dispute]; *accord*, Dkt. No. 21, Attach. 4, at 19 [Milne's Depo. Tr.].)

[88]         (*Compare* Dkt. No. 23, Attach. 2, at ¶ 15 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt.

16.     Milne spoke with Chapple (on the phone and in person), as well as with Plaintiff, to discuss the altercation.

17.     Plaintiff disputed Chapple's description of the incident and asserted that Chapple had knocked over the packages, did not allow him to help, and was "[e]xtremely vulgar" to him.[89]

18.     On March 3, 2015, at a meeting with Plaintiff, Milne, and a Union representative, Plaintiff was suspended for one day as discipline for his failure to follow methods, procedures, and instructions regarding the delivery to Chapple.

19.     According to Milne's memorandum to Sebastian-Dean regarding this meeting, Milne advised Plaintiff that UPS package drivers routinely make deliveries onto docks; and, in response, Plaintiff stated his understanding that UPS package drivers are not required to make deliveries onto docks.[90]

20.     At the meeting held on March 3, 2015, Plaintiff, Milne, and the Union representative also discussed Plaintiff's alleged failure to report an injury in a timely fashion. More specifically, at some point, Plaintiff had complained of numbness in his toes; and UPS

No. 29 at ¶ 15 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" a fact not asserted by UPS (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord,* Dkt. No. 23, Attach. 6, at UPS4980 [letter from Chapple to UPS, dated 3/3/15].)

[89]     (Dkt. No. 21, Attach. 2, at 276 [Plf.'s Depo. Tr.].)

[90]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 19 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 19 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent that" another witness testified about the condition of the dock at issue, but failing to clarify what portion of the fact asserted he actually "[d]ispute[s]" and to cite record evidence giving rise to a factual dispute]; *accord,* Dkt. No. 23, Attach. 6, at UPS4988 [Memorandum from Milne to Sebastian-Dean, dated 3/3/15].)

contended that Plaintiff reported that this injury occurred two weeks earlier. At the meeting, Milne informed Plaintiff that he would receive an official warning notice for failing to timely report his injury.[91]

21. On or about March 19, 2015, the Union grieved the one-day suspension on Plaintiff's behalf on the basis that UPS improperly issued both a warning and suspension for the same allegation of "failing to follow methods."

22. In advance of the arbitration hearing, the Union prepared a statement[92] on behalf of Plaintiff. In the statement, the Union argued that Chapple had been verbally abusive to Plaintiff, and had caused the packages to fall. Moreover, the Union asserted that Plaintiff had not violated any UPS policy or procedure in this instance. This statement was presented and submitted to the arbitration panel on September 16, 2015.

23. UPS prepared a statement, which was also presented and submitted to the arbitration panel on September 16, 2015. UPS's statement asserted, *inter alia*, that (a) Plaintiff

---

[91] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 20 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 20 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" fact asserted "to the extent that" he did not report his injury two weeks earlier because "none occurred at that time"]; *accord,* Dkt. No. 23, Attach. 6, at UPS4988 [Memorandum from Milne to Sebastian-Dean, dated 3/3/15].) Plaintiff does not dispute the facts that his alleged failure to report the injury to his toes (1) was actually discussed at the meeting on March 3, 2015, and (2) resulted in him receiving an official warning notice. When asked during his deposition about the actual date of his injury, Plaintiff testified, somewhat confusingly, that he began feeling numbness in his toes "[p]ersistently on March 3" (i.e., the day he reported it), but that his "toes had become frozen, cold," two weeks earlier due to the "especially severe winter" weather. (Dkt. No. 21, Attach. 2, at 266 [Plf.s' Depo. Tr.].) Moreover, Plaintiff testified that, at some point, his doctor concluded that the numbness in his toes "was a result of a nerve . . . in [his] back" and his "back issues." (*Id.* at 268.)

[92] The "statements" referenced in UPS's Rule 7.1 Statement are the written "briefs" (referred to in the Union's Rule 7.1 Statement) submitted by UPS and the Union to the arbitration panel in relation to Plaintiff's grievances.

had "failed to follow proper company methods, procedures, and instructions regarding his handling of packages as well as his inappropriate behavior resulting in a customer complaint," (b) it had received Chapple's complaint that Plaintiff had confronted her, as well as pictures of improperly handled packages that were not stacked on Chapple's dock, (c) Plaintiff refused to take responsibility for what happened at a meeting to discuss the incident, and (d) Plaintiff could not explain why he did not approach the dock via the man-door to complete the delivery. Based on these assertions, UPS requested that the arbitration panel deny Plaintiff's grievance and uphold his suspension.[93]

24. Based on the facts and arguments presented by UPS and the Union, the Panel reduced Plaintiff's suspension to a written warning.

### Plaintiff's Failure to Comply with the 9.5 Policy

25. In February 2015, Sebastian-Dean (UPS's Business Manager), instituted a policy pursuant to which package car drivers were required to call their direct supervisor's cell phone if they were going to be working over 9.5 hours that day (i.e., the 9.5 policy described above).

26. During his deposition, Milne testified that, at a Pre-work Communications Meeting ("PCM"), held sometime before April 2015, he instructed all drivers under his supervision–including Plaintiff, who was present at the meeting–to write down Milne's cell

---

[93] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 23 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 23 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" a fact not asserted by UPS (i.e., that Plaintiff did not dispute Chapple's version of events) and asserting several additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord,* Dkt. No. 23, Attach. 6, at UPS4972-5006 [UPS's brief regarding Case No. 20-15 and attached exhibits].)

phone number to use as part of their compliance with the 9.5 policy.[94]

27.     During his deposition, Plaintiff testified that he recalled Milne asking him and the other drivers, at a PCM held on April 2, 2015, to write down Milne's cell phone number.[95]

28.     Plaintiff did not write down Milne's cell phone number at that time, but requested that Milne's number be sent to Plaintiff personally via UPS's DIAD messaging system.

29.     Plaintiff was unaware of any other UPS package car driver who refused to write down his or her supervisor's number when directed to do so.

30.     On or about April 2, 2015, at a meeting between Plaintiff, Milne, and Perry (the Union Shop Steward), Plaintiff was suspended for three days as discipline for failing to call his supervisor (Milne) to inform him that he was going to exceed 9.5 hours of work that day, as he had been instructed.

31.     Two other UPS employees were present at the meeting.[96]

---

[94]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 27 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 27 [Plf.'s Rule 7.1 Response to UPS, "[d]isput[ing]" fact asserted only to the extent that he "had never heard of the 9.5 Rule[] prior to April 2, 2015," and that the 9.5 policy was not in writing].)

[95]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 28 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 28 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" fact asserted and asserting additional fact (i.e., that he "requested that Milne send his cell phone number to him via the DIAD board,"), but failing to cite record evidence giving rise to a factual dispute].)

[96]     (Dkt. No. 21, Attach. 1, at 291-92 [Plf.'s Depo. Tr.].)  UPS asserts that these other employees were "awaiting discipline" because they also violated the 9.5 policy.  (Dkt. No. 23, Attach. 2, at ¶ 32 [UPS's Rule 7.1 Statement].)  However, UPS's record citation in support of this assertion–to Plaintiff's deposition testimony–does not support it.  (Dkt. No. 21, Attach. 2, at 291 [Plf.'s Depo. Tr., at which Plaintiff testified, "I don't remember who was issued suspensions or disciplines and what they were about.  I just remember the presence of them"].)  However, Plaintiff also testified that "[o]ne of the people in there . . . I was aware . . . was in that room for the same reason I was."  (Dkt. No. 21, Attach. 2, at 302.)  In any event, Plaintiff does not dispute

32.     During his deposition, Plaintiff testified that "the way it was always explained [was] to call Bob [Milne] on his cell phone" when a driver knew that he or she was going to exceed 9.5 hours in a work day.[97]

33.     On April 2, 2015, the 9.5 policy was explained to Plaintiff, and Plaintiff was instructed by his supervisor to call Milne's cell phone when Plaintiff was going to be working more than 9.5 hours.

34.     However, Plaintiff testified during his deposition that he thought it was outside the scope of Milne's authority to require a driver to call his cell phone to report that he or she would be exceeding 9.5 hours on a work day.[98]

35.     On or about April 8, 2015, the Union grieved this three-day suspension on Plaintiff's behalf (Case No. 21-15).  The basis for the Union's grievance was that Plaintiff did not have Milne's cell phone number and, therefore, could not call him as directed.

36.     During his deposition, Plaintiff testified that he was not aware of any other driver who had grieved discipline for allegedly violating the 9.5 policy.

37.     In advance of the arbitration hearing, the Union prepared a statement on Plaintiff's behalf.  The Union's statement asserted, *inter alia*, that (a) drivers may communicate with their supervisors through *either* the DIAD or through personal cell phones, (b) Plaintiff was following

_____

the above-stated fact (i.e., that two other employees were present at the meeting).  The Court notes that Sebastian-Dean testified during her deposition that "Bill Barrett, Al Goodwin, Dave Rivera, [and] Jeremy Shatraw" were also disciplined for violating the 9.5 policy, but it is unclear if this occurred at the same meeting.  (Dkt. No. 21, Attach. 5, at 110 [Sebastian-Dean Depo. Tr.].)

[97]     (Dkt. No. 21, Attach. 2, at 292 [Plf.'s Depo. Tr.].)

[98]     (Dkt. No. 21, Attach. 2, at 295-96 [Plf.'s Depo. Tr.].)

past instructions by using the DIAD, and legitimately requested that he receive the new instruction to contact Milne via cell phone in writing, and (c) Plaintiff had not received the instruction, or Milne's cell phone number at that time, and, for this reason, discipline was inappropriate. This statement was ultimately presented and submitted to the arbitration panel on September 16, 2015.

38.     UPS also prepared a statement and submitted it to the arbitration panel. UPS's statement asserted, *inter alia*, that (a) a clear directive was given to all Potsdam UPS drivers (including Plaintiff) that, if a driver was going to work more than 9.5 hours on a given day, he or she was required to contact his or her supervisor by calling the supervisor's cell phone, (b) Milne provided his cell phone number to the drivers and instructed that they write it down, and (c) during a meeting regarding his failure to follow the 9.5 policy, Plaintiff stated that he was not "officially" given the policy and he therefore did not comply. Based on these assertions, UPS argued that the arbitration panel should uphold the discipline imposed against Plaintiff.[99]

39.     Based on the facts and arguments presented by the Union and UPS, the Panel reduced Plaintiff's three-day suspension to a one-day suspension.

**Plaintiff's Continued Failure to Comply with the 9.5 Policy**

40.     As of April 2, 2015, Plaintiff was aware of the 9.5 policy, and was given Milne's cell phone number twice that day: once at the PCM held that morning, and again during his disciplinary meeting in the presence of the Union Shop Steward.

41.     Between April 2, 2015, and April 7, 2015, Plaintiff refused to write down Milne's cell phone number and did not ask any co-worker for the number because, in his view, he "had

---

[99]     (Dkt. No. 23, Attach. 7, at UPS512-513 [UPS's brief regarding Case No. 21-15 and attached exhibits].)

no reason to."[100]

42.     On April 6, 2015, Plaintiff worked more than 9.5 hours.[101]

43.     Plaintiff did not call Milne on that date to inform him that he would be working more than 9.5 hours.[102]

44.     On or about April 7, 2015, at a disciplinary meeting with Sebastian-Dean and Perry, Plaintiff was suspended for five days for his continued failure to comply with the 9.5 policy.

45.     At the disciplinary meeting, Sebastian-Dean wrote down Milne's cell phone number for Plaintiff.

46.     At the disciplinary meeting, Sebastian-Dean also discussed with Plaintiff that she noticed he was working through his lunch break; indeed, records reflected that Plaintiff was taking a lunch break and recording stops during that break time.  Sebastian-Dean advised Plaintiff that he was required to take a 45-minute lunch break each day.

---

[100]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 42 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 42 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord*, Dkt. No. 21, Attach. 2, at 302 [Plf.'s Depo. Tr.].)

[101]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 43 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 43 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact  and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord*, Dkt. No. 21, Attach. 2, at 303 [Plf.'s Depo. Tr.].)

[102]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 44 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 44 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord*, Dkt. No. 21, Attach. 2, at 303 [Plf.'s Depo. Tr.].)

47.　　　On April 7, 2015, while he was working, Plaintiff reported (to either Milne or Sebastian-Dean) that his cab was filling up with smoke and fumes.[103]

48.　　　On or about April 10, 2015, the Union grieved the five-day suspension on Plaintiff's behalf, and asserted that (a) Plaintiff had not been permitted to take an appropriate lunch break, and (b) his vehicle had smoke and fumes coming out of it.

49.　　　In anticipation of an arbitration hearing on its grievance, the Union prepared a statement on Plaintiff's behalf. The Union's statement asserted, *inter alia*, that (a) Plaintiff had not violated any UPS policy or procedure in attempting to finish his work on April 6, 2015, (b) Plaintiff still had not been given Milne's cell phone number in a DIAD message as he had requested, and (c) Plaintiff had sent a message via his DIAD that he would be working more than 9.5 hours that day. The Union's statement was presented and submitted to the arbitration panel

---

[103]　　　(Dkt. No. 20, Attach. 20, at 4 of CM/ECF pagination [grievance form, dated 4/10/15]; *accord*, Dkt. No. 21, Attach. 2, at 342-43 [Plf.'s Depo. Tr.].) UPS asserts that Sebastian-Dean instructed him not to continue driving his package car and that Plaintiff disobeyed this instruction, but UPS's record citations do not appear to support these assertions. (Dkt. No. 23, Attach. 2, at ¶ 48 [UPS's Rule 7.1 Statement].) However, a memorandum by Sebastian-Dean, dated April 7, 2015, states (among other things) that Sebastian-Dean "instructed [Plaintiff] not [to] get back into the vehicle if it had smoke and fumes in the cab," and that Plaintiff responded that he "was just going to keep working because he didn't want to get fired for not completing his work." (Dkt. No. 23, Attach. 7, at UPS5097.) Plaintiff's grievance related to this incident states that Sebastian-Dean "instructed Bob to instruct me to drive this same vehicle back to Potsdam, hooked to a trailer full of packages." (Dkt. No. 20, Attach. 20, at 4 of CM/ECF pagination].) During his deposition, Plaintiff testified that he recalled talking to Sebastian-Dean on that date, but that he did not recall her instructing him *not* to drive his package car. (Dkt. No. 21, Attach. 2, at 343.) In his declaration filed in opposition to Defendants' respective motions, Plaintiff asserted that, "[i]n approximately January/February 2015, longstanding and persistent smoke fume problems in [his] truck re-emerged," but that Sebastian-Dean "insisted that [he] continue to operate and drive this vehicle." (Dkt. No. 28, Attach. 3, at ¶ 5 [Plf.'s Decl.].) Plaintiff's declaration does not specify the date on which Sebastian-Dean articulated this insistence.

on September 16, 2015.[104]

50. UPS also prepared a statement and submitted it to the arbitration panel. UPS's statement asserted, *inter alia*, that (a) Plaintiff had already received discipline for failing to call Milne when he was going to be working more than 9.5 hours, and, three work days after that discipline, he again failed to abide by the call-in policy, (b) during the disciplinary meeting, Plaintiff first stated that he did not have Milne's phone number, then stated that he was waiting for Milne to provide it, and, finally, stated that it had slipped his mind and that he would be "happy to call Bob," and (c) Plaintiff accused his superiors of "harassing" him by questioning his failure to abide by the 9.5 policy. Based on these assertions, UPS argued that Plaintiff refused to follow instructions and that the arbitration panel should uphold the discipline issued to him.[105]

51. Each discipline issued to Plaintiff was accompanied by a letter which stated as follows: "If, in the future, you should again fail to follow any proper methods, procedures, and instructions, further disciplinary action will be taken, up to and including discharge."[106]

52. Based on the facts and arguments presented by UPS and the Union, the arbitration panel denied the Union's claim and upheld Plaintiff's five-day suspension.

---

[104] (Dkt. No. 23, Attach. 7, at UPS5049-5053 [Union's brief regarding Case No. 22-15 and attached exhibits].)

[105] (Dkt. No. 23, Attach. 7, at UPS5032-5048 [UPS's brief regarding Case No. 22-15 and attached exhibits].)

[106] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 52 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 52 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute].)

**Plaintiff's Failure to Accurately Record Deliveries, Follow Instructions, and Take and Record a Lunch Break Pursuant to UPS Policy and His Manager's Instructions**

53.     On or about April 17, 2015, at a meeting with Plaintiff, Dean, Perry, Speller (Labor Manager), Jim Dolan (District Labor Manager), and Hammond, Plaintiff was discharged for his alleged persistent failure to follow proper delivery methods, procedures, and instructions, as well as his continued failure to follow his supervisor's instructions.[107]

54.     A working discharge permitted Plaintiff to continue working for UPS as a package car driver until the arbitration panel rendered a decision.

55.     Plaintiff was discharged for allegedly improperly recording deliveries, failing to follow Sebastian-Dean's instructions to park his package car when he reported it as unsafe to drive, and failing to follow UPS policy and Sebastian-Dean's instructions to take proper lunch breaks.

56.     UPS delivery records (referred to by the parties, and in this Decision and Order, as "Telematics") for April 6, 2015, reflect that Plaintiff recorded four delivery stops, each with separate signatures in a 29-minute time span, but all for the same delivery address.[108]

---

[107]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 54 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 54 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts and legal arguments (i.e., that "UPS was discharging him in retaliation for filing . . . OSHA complaints"), but failing to cite record evidence giving rise to a factual dispute]; *accord,* Dkt. No. 23, Attach 7, at UPS5075 [Official Discharge Notice, dated 4/20/15]; Dkt. No. 21, Attach. 2, at 313-16 [Plf.'s Depo. Tr.].)

[108]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 57 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 57 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts and legal arguments (i.e., that "UPS breached" Article 6 of the CBA by "misusing technology (Telematics) to secure this evidence in exclusive support of its wrongful discharge of Plaintiff"), but failing to cite record evidence giving rise to a factual dispute].)

57.     UPS Stop Recording Procedures require (with certain exceptions) that, when a driver (a) makes a second attempt of delivery for a time-committed package, or (b) returns to an address upon identifying a package that should have been delivered earlier, such a stop must be recorded as a "duplicate stop," and not as an "individual stop recording."[109]

58.     Plaintiff was also discharged for the reason that, according to UPS, he did not record a "left at" stop in his DIAD when a customer approached his truck and asked for a package from the truck, after he had already completed a delivery at her address to a different consignee.[110]

59.     UPS Stop Recording Procedures require that, when a valid delivery attempt has been made, and packages are later left with someone other than the original consignee, it must be designated as "left at."[111]

60.     On April 6, 2015, Plaintiff delivered two packages to the same address, recorded one of the two packages as "Holiday," and, in doing so, took two stop credits for that one stop.[112]

---

[109]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 58 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 58 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent that Plaintiff categorically denies any wrongdoing in the manner in which he sheeted packages," and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[110]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 59 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 59 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent set forth in Nos. 57 and 58," but failing to cite record evidence giving rise to a factual dispute].)

[111]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 60 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 60 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent set forth in Nos. 57 and 58," but failing to cite record evidence giving rise to a factual dispute].)

[112]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 61 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶

61.     Plaintiff also delivered multiple packages to "Crow Smith," some signed for by "Crow" and another by "Betsey Smith."  In doing so, Plaintiff again recorded multiple stops.[113]

62.     Pursuant to the CBA, Plaintiff is entitled to a 45-minute unpaid lunch break.

63.     During his deposition, Plaintiff testified that, on days that he took a lunch break, he recorded that fact on his DIAD; and, on days when he recorded on his DIAD that he had taken a lunch break, he did, in fact, take a lunch breach during the recorded time periods.  Moreover, Plaintiff testified that, as a general matter, he "did not falsify records of taking" a lunch break.[114]

64.     UPS internal memoranda and timecards reflect that Plaintiff made package delivery stops during his recorded lunch breaks, and, on some work days, did not record lunch breaks at all.  Moreover, Plaintiff testified during his deposition that there were occasions on which he did not take a 45-minute unpaid lunch.[115]

---

61 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent set forth in Nos. 57 and 58," but failing to cite record evidence giving rise to a factual dispute].)

[113]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 62 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 62 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent set forth in Nos. 57 and 58," but failing to cite record evidence giving rise to a factual dispute].)

[114]     (Dkt. No. 21, Attach. 2, at 334-35, 337 [Plf.'s Depo. Tr.].)

[115]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 65 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 65 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" fact asserted as "[t]aken out of context," but failing to cite record evidence giving rise to a factual dispute].) During his deposition, Plaintiff also testified that he has "been instructed to record lunches and not take them," and "instructed to record a lunch regardless of whether or not [h]e took it, period."  (Dkt. No. 21, Attach. 2, at 333, 335 [Plf.'s Depo. Tr.].)

65.     UPS internal memoranda reflect that Plaintiff complained of smoke and fumes in his cab, and that Sebastian-Dean instructed Plaintiff not to get back in his cab and to remain parked until Milne arrived to assist him.[116]

66.     During his deposition, Plaintiff testified that he did not remember Sebastian-Dean directing him not to operate his vehicle at that time, and that he continued to operate his vehicle.[117]

67.     At the April 17, 2015, meeting, Hammond tried to negotiate with UPS to reduce Plaintiff s discharge to a lesser form of discipline, but UPS rejected his settlement attempts.[118]

---

[116]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 66 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 66 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent [that Sebastian-]Dean insisted that Plaintiff continue to operate and drive this vehicle"].)  As noted above, Plaintiff's grievance related to this incident states that Sebastian-Dean "instructed Bob to instruct me to drive this same vehicle back to Potsdam, hooked to a trailer full of packages." (Dkt. No. 20, Attach. 20, at 4 of CM/ECF pagination].)  During his deposition, Plaintiff testified that he recalled talking to Sebastian-Dean on that date, but that he did not recall her instructing him *not* to drive his package car.  (Dkt. No. 21, Attach. 2, at 343.)  In his declaration filed in opposition to Defendants' respective motions, Plaintiff asserted that, "[i]n approximately January/February 2015, longstanding and persistent smoke fume problems in [his] truck re-emerged," but that Sebastian-Dean "insisted that [he] continue to operate and drive this vehicle."  (Dkt. No. 28, Attach. 3, at ¶ 5 [Plf.'s Decl.].)  Plaintiff's declaration does not specify the date on which Sebastian-Dean articulated this insistence.

[117]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 67 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 67 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact, but failing to cite record evidence giving rise to a factual dispute].)

[118]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 68 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 68 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact based on his assertion, in his declaration filed in opposition to Defendants' respective motions, that he "does not remember Hammond or any other UNION official saying anything in [his] defense" at the meeting].)  *See, supra,* note 34 of this Decision and Order.

68. On or about April 21, 2015, the Union grieved the discharge on Plaintiff's behalf on the basis requested by Plaintiff. More specifically, the Union asserted that Plaintiff had been "harassed and over supervised" by UPS management, that he followed appropriate methods, and that, for each of these reasons, the discharge was not warranted.[119]

69. In advance of the arbitration hearing, the Union prepared a statement on Plaintiff's behalf. The Union's statement asserted, *inter alia*, that (a) Plaintiff had not violated any UPS policy or procedure regarding improper recording of package deliveries, and (b) Plaintiff believed all of the discipline being issued to him was in retaliation for an OSHA complaint he filed regarding work-related safety concerns at the UPS facility, and that Plaintiff was therefore improperly discharged. The Union's statement was ultimately presented and submitted to the arbitration panel on September 16, 2015.[120]

70. UPS also prepared a statement and submitted it to the arbitration panel. UPS's Statement asserted, *inter alia*, that (a) Plaintiff refused to take any responsibility for his actions that resulted in the first three issued disciplines, (b) at Plaintiff's disciplinary meeting, UPS personnel questioned Plaintiff about his package recording procedures–particularly "duplicate stop" procedures–and learned that he was not properly sheeting packages, resulting in an inflated number of stops, driver stop credits, and hours worked, (c) Plaintiff failed to follow Sebastian-

---

[119] (Dkt. No. 23, Attach. 7, at UPS5102 [grievance form, dated 4/21/15].)

[120] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 70 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 70 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts and legal arguments (i.e., that the Union's "statement of Plaintiff's rights under the CBA was 'perfunctory' at best, and therefore 'arbitrary'"), but failing to cite record evidence giving rise to a factual dispute]; *accord,* Dkt. No. 23, Attach. 8, at 5 of the CM/ECF pagination [Union's Statement Regarding Case No. 23-15].)

Dean's instructions that he park his vehicle due to its mechanical issues and wait for assistance, and (d) Plaintiff failed to take lunch breaks as required by the CBA, despite instruction by Sebastian-Dean to take lunch breaks. Based on these assertions, UPS argued that Plaintiff had not, and would not, correct his behavior, and that the arbitration panel should uphold Plaintiff's discharge.[121]

71.     During her deposition, Sebastian-Dean testified that she learned that Plaintiff had made OSHA complaints "[l]ong after [they] were made," but could not recall exactly when she learned this fact.[122]

72.     During his deposition, Plaintiff testified that he filed an OSHA complaint after he had already been issued discipline.[123]

---

[121]     (Dkt. No. 23, Attach. 7, at UPS5069-5100 [UPS's brief regarding Case No. 23-15, with attached exhibits].)

[122]     (Dkt. No. 21, Attach. 5, at 51 [Sebastian-Dean's Depo. Tr.].) Although UPS asserts that Sebastian-Dean testified that she "did not find out that Plaintiff filed an OSHA complaint until after discipline had been imposed against him" (Dkt. No. 23, Attach. 2, at ¶ 71 [UPS's Rule 7.1 Statement]), it is unclear from her deposition testimony (1) whether she *learned of* the OSHA complaints sometime before Plaintiff was subjected to discipline or whether she learned that *Plaintiff* was the complainant before he was subjected to discipline, or (2) when, in any event, she actually learned either of these facts (i.e., before or after Plaintiff was disciplined). (Dkt. No. 21, Attach. 5, at 51-52 [Sebastian-Dean's Depo. Tr., in which Sebastian-Dean testified, "I said yes," when asked, "[W]hile you were the manager at the facility between February [20]15 and April 2016, did you ever learn that Rob Carlisle had made OSHA complaints?"]; *id.* at 52 [in which Sebastian-Dean testified, "I don't recall the dates," when asked, "When did you learn that Mr. Carlisle had made OSHA complaints?"].)

[123]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 72 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 72 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute].)

73.     Based on the facts and arguments presented by UPS and the Union, the arbitration panel denied the Union's grievance and upheld UPS's discharge of Plaintiff.[124]

**Action Taken by The Union on Plaintiff's Behalf in Advance of the Arbitration Hearing**

74.     An arbitration panel hearing was initially scheduled for May 2015 to hear all four grievances brought by the Union and Plaintiff.  Thereafter, both UPS and the Union exercised their right under the CBA to secure a single postponement of the hearing.  The Union exercised its postponement at Plaintiff's request.

75.     In early April 2015 (before Plaintiff was discharged), Hammond tried to negotiate with UPS to reduce Plaintiff's suspensions to a lesser form of discipline, but UPS suggested that it be discussed at the next meeting between UPS, Plaintiff, and the Union.[125]

76.     At the disciplinary meeting held on April 17, 2015, Hammond again tried to negotiate with UPS to reduce Plaintiff's discharge to a lesser form of discipline, but UPS rejected his settlement attempts and moved forward with the discipline.[126]

---

[124]     (Dkt. No. 23, Attach. 7, at UPS5067.)

[125]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 76 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 76 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" fact not asserted by UPS (i.e., that no Union official "advise[d him] that they had ever discussed his pending disciplinary charges with UPS management . . ."), but failing to cite record evidence giving rise to a factual dispute].)

[126]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 77 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 77 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" fact not asserted by UPS (i.e., that no Union official "advise[d him] that they had ever discussed his pending disciplinary charges with UPS management . . ."), but failing to cite record evidence giving rise to a factual dispute].)

77. At the disciplinary meeting held on April 17, 2015, Hammond defended Plaintiff's positions with respect to each of his grievances.[127]

78. Hammond made another attempt to negotiate on Plaintiff s behalf and reach a settlement with UPS to reduce Plaintiff's discharge before the arbitration panel hearing was held on September 16, 2015. In response, UPS simply told Hammond "no."[128]

79. Hammond met with Plaintiff prior to the hearing to prepare Plaintiff's prosecution of the grievances.[129]

80. Hammond met with Plaintiff "on a certain day in June [2015]," after which Hammond prepared the Union's statement and exhibits to the arbitration panel on Plaintiff's behalf.[130]

81. Hammond e-mailed Plaintiff copies of the briefs to be submitted to the arbitration panel to allow Plaintiff an opportunity to review and make any desired changes to them, and to

---

[127] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 78 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 78 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact based on his assertion, in his declaration filed in opposition to Defendants' respective motions, that he "does not remember Hammond or any other UNION official saying anything in [his] defense" at the meeting].) *See, supra,* note 34 of this Decision and Order.

[128] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 79 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 79 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" fact not asserted by Defendant (i.e., that no Union official "advise[d him] that they had ever discussed his pending disciplinary charges with UPS management . . ."), but failing to cite record evidence giving rise to a factual dispute].)

[129] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 80 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 80 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[130] (Dkt. No. 21, Attach. 1, at 106 [Plf.'s Depo. Tr.].)

verify their content and ensure that they contained the evidence that Plaintiff wanted to present.[131]

82. During his deposition, Plaintiff testified that Hammond gave him an opportunity to comment on the Union's submission prior to the hearing.[132]

83. During his deposition, Plaintiff testified that he did, in fact, review the Union's submissions when he received it in June 2015, but that he could not remember if he gave Hammond any suggestions about how to change it.[133]

---

[131] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 82 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 82 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact based on his assertions, contained in his declaration filed in opposition to Defendants' respective motions, that he "was not aware" that the documents sent by Hammond were "the final product . . . submitted to the Panel," and that he "does not remember being allowed an opportunity to review the briefs and to make any desired changes . . . ," but failing to cite record evidence giving rise to a factual dispute].) *See, supra,* note 34 of this Decision and Order.

[132] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 83 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 83 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact based on his assertions, contained in his declaration filed in opposition to Defendants' respective motions, that he "was not aware" that the documents sent by Hammond were "the final product . . . submitted to the Panel," and that he "does not remember being allowed an opportunity to review the briefs and to make any desired changes . . . ," but failing to cite record evidence giving rise to a factual dispute].) *See, supra,* note 34 of this Decision and Order.

[133] (*Compare* Dkt. No. 23, Attach. 2, at ¶ 84 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 84 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact based on his assertions, contained in his declaration filed in opposition to Defendants' respective motions, that he "was not aware" that the documents sent by Hammond were "the final product . . . submitted to the Panel," and that he "does not remember being allowed an opportunity to review the briefs and to make any desired changes . . . ," but failing to cite record evidence giving rise to a factual dispute].) *See, supra,* note 34 of this Decision and Order.

84. During his deposition, Hammond testified that Plaintiff suggested changes to the Union's submissions, and provided pictures to use as evidence in support thereof.[134]

85. During his deposition, Hammond testified that he incorporated the changes suggested and evidence provided by Plaintiff.[135]

86. In support of Plaintiff's grievances (and based on Plaintiff's suggestions), Hammond prepared four "briefs" to be read aloud and submitted to the arbitration panel, along with exhibits.[136]

87. The arbitration panel hearing was rescheduled for September 16, 2015, and Plaintiff was notified of this fact.

---

[134]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 85 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 85 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact based on his assertions, contained in his declaration filed in opposition to Defendants' respective motions, that he "was not aware" that the documents sent by Hammond were "the final product . . . submitted to the Panel," and that he "does not remember being allowed an opportunity to review the briefs and to make any desired changes . . . ," but failing to cite record evidence giving rise to a factual dispute].)  *See, supra,* note 34 of this Decision and Order.

[135]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 86 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 86 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact based on his assertions, contained in his declaration filed in opposition to Defendants' respective motions, that he "was not aware" that the documents sent by Hammond were "the final product . . . submitted to the Panel," and that he "does not remember being allowed an opportunity to review the briefs and to make any desired changes . . . ," but failing to cite record evidence giving rise to a factual dispute].)  *See, supra,* note 34 of this Decision and Order.

[136]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 87 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 87 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact based on his assertions, contained in his declaration filed in opposition to Defendants' respective motions, that he "was not aware" that the documents sent by Hammond were "the final product . . . submitted to the Panel," and that he "does not remember being allowed an opportunity to review the briefs and to make any desired changes . . . ," but failing to cite record evidence giving rise to a factual dispute].)  *See, supra,* note 34 of this Decision and Order.

88. After receiving notice of the new hearing date, Plaintiff asked for the panel hearing to be postponed because he was on a medical leave of absence from work.

89. On behalf of the Union, Hammond informed Plaintiff that, in order to request another adjournment of the hearing, Plaintiff would need to provide medical documentation relevant to his ability to attend the hearing. Moreover, Hammond informed Plaintiff that he would hold a conference call with the panel committee to attempt to secure another adjournment, even though it was outside of the rules of procedure for panel hearings.

90. Plaintiff did not provide any medical documentation to Hammond in support of his request for an adjournment of the hearing.

91. Plaintiff then asked for the panel hearing to be postponed because he had retained a private attorney. When advised by the Union's counsel that privately retained attorneys were not permitted to attend panel hearings, Plaintiff's retained attorney asserted that he needed more time to prepare Plaintiff.

92. The Rules of Procedure for arbitration panel hearings state that only one adjournment per party is permitted, and that, if a party fails to appear, the arbitration may proceed.[137]

93. Hammond informed Plaintiff that the Union would be prepared to submit Plaintiff's case to the arbitration panel, even if its (second) requested adjournment were not granted.

---

[137] (Dkt. No. 23, Attach. 8, at 17 of the CM/ECF pagination [e-mail from the Union to Plaintiff, dated 9/11/15, containing "a copy of the Rules of Procedure pertaining to adjournments"].)

94.     On September 14, 2015, Hammond advised Plaintiff that Perry would drive him to the arbitration hearing.

95.     Plaintiff did not accept the offer for a ride to the hearing and did not attend the hearing.

96.     On the morning of the hearing, before the hearing commenced, an arbitration panel member called Plaintiff and asked him if he would be attending the hearing. Plaintiff explained that he could not attend because he was on medical leave.

97.     Plaintiff went out on medical leave in June 2015.

98.     Although he was out on medical leave, on August 3, 2015, Plaintiff attended an in-person meeting with UPS and the Union to discuss additional disciplines he had received.

99.     Briefs with exhibits in support of Plaintiff s grievances were presented to the arbitration panel for each grievance at issue.[138]

100.     During his deposition, Plaintiff testified that he had no evidence that any arbitration panel members had any animus toward him or dislike of him.

101.     During his deposition, Plaintiff testified that he "did not have access to Mr. Hammond to explain these things to thoroughly defend me, prior to the panel or at the panel."[139]

---

[138]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 101 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 101 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[139]     (*Compare* Dkt. No. 23, Attach. 2, at ¶ 105 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 105 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord*, Dkt. No. 21, Attach. 1, at 115 [Plf.'s Depo. Tr.].)

102.    During his deposition, Plaintiff testified that no witnesses were called on his behalf at the hearing.[140]

### Additional Discharges Referenced by Plaintiff

### Plaintiff's Failure to Follow Proper Safety Methods

103.    On or about June 4, 2015, at a meeting with Dean, Perry, and Milne, Plaintiff was issued a second discharge for allegedly "fail[ing] to follow proper safety methods, procedures and instructions."[141]

104.    This discharge was imposed due to an incident on May 29, 2015, during which Plaintiff was seen driving a golf cart around the UPS Potsdam facility parking lot when drivers were exiting the facility at morning dispatch.  Milne and Sebastian-Dean opined that Plaintiff's behavior created safety concerns.[142]

105.    Plaintiff admitted that he was driving a golf cart on that day at the UPS Potsdam facility.

106.    Plaintiff could not remember "what space of the parking lot [the golf cart] occupied when [he] left it to run in and get [his] [pay]check."[143]

107.    The discharge related to the golf cart incident was not brought before the

---

[140]    (Dkt. No. 21, Attach. 1, at 115-16 [Plf.'s Depo. Tr.].)

[141]    (Dkt. No. 23, Attach. 8, at 34 of the CM/ECF pagination [Official Discharge Notice, dated 6/4/15].)

[142]    (*Compare* Dkt. No. 23, Attach. 2, at ¶ 106 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 106 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" fact asserted and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute].)

[143]    (Dkt. No. 21, Attach. 2, at 323 [Plf.'s Depo. Tr.].)

arbitration panel.[144]

**Plaintiff's Continued Failure to Comply with the 9.5 Policy**

108.    On or about June 5, 2015, at a meeting with Sebastian-Dean and Perry, Plaintiff was issued a third discharge for his alleged failure to contact his supervisor (Milne) when he was going to be working more than 9.5 hours on June 4, 2015.[145]

109.    Plaintiff did not dispute that he failed to call Milne on that date when he worked more than 9.5 hours.  However, during his deposition, Plaintiff testified that he was not aware that he worked more than 9.5 hours that day, and this occurred as a result of him not properly recording his lunch in his DIAD.

110.    The third discharge has not been brought before the arbitration panel.[146]

---

[144]    (Dkt. No. 21, Attach. 2, at 327 [Plf.'s Depo. Tr.].)  In its Rule 7.1 Statement, UPS asserts that the reason that this discharge was not brought before the arbitration panel was "because Plaintiff's first discharge was upheld."  (Dkt. No. 23, Attach. 2, at ¶ 109 [UPS's Rule 7.1 Statement].)  However, the record citation provided by UPS does not appear to support this portion of its assertion; and, as noted above, Plaintiff's discharge was not upheld by the arbitration panel until September 2015.  In his Rule 7.1 Response, Plaintiff asserts that the Union "did not file this grievance," but the record citation he offers in support does not support this assertion.  (Dkt. No. 29 at ¶ 109 [Plf.'s Rule 7.1 Response to UPS].)  Plaintiff cites his own deposition testimony in which he testified that he filed a grievance related to a discharge, but, in that testimony, Plaintiff was being examined with respect to a discharge for violating the 9.5 policy (and not the golf cart incident).  (Dkt. No. 21, Attach. 2, at 327-28 [Plf.'s Depo. Tr.].)  In any event, UPS asserts, and Plaintiff does not dispute, that the discharge related to the golf cart incident was not presented to the arbitration panel.

[145]    (*Compare* Dkt. No. 23, Attach. 2, at ¶ 110 [UPS's Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 110 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" fact asserted and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord*, Dkt. No. 23, Attach. 8, at UPS4042 [Official Discharge Notice, dated 6/5/15].)

[146]    (Dkt. No. 21, Attach. 2, at 327 [Plf.'s Depo. Tr.].)  As set forth *supra*, in note 138 of this Decision and Order, Plaintiff testified that he filed a grievance in relation to this discharge.  (*Id.*)  The basis for his grievance was that he "was not aware that [he] was over nine and a half hours . . . that particular day."  (*Id.* at 328.)

## Plaintiff's Falsification Of Records

111.    On or about August 3, 2015, at a meeting with Perry, Hammond, Shaw, and

Speller, Plaintiff was issued a fourth discharge for his alleged dishonesty and falsification of

records.[147]

112.    Plaintiff denied that he had forged customer signatures.

## Plaintiff's Relationship with Brian Hammond

113.    Hammond made efforts to find Plaintiff employment following Plaintiff's

termination.

## Additional Relevant CBA Provisions

114.    Pursuant to the CBA, UPS has the "exclusive" authority to promulgate and

enforce

> reasonable rules and regulations relating to the operation of
> [UPS's] business, the establishment of reporting times, the right to
> hire, transfer, suspend, layoff, recall, promote, demote, discharge
> for just cause, assign or discipline employees, to relieve employees
> from duties because of lack of work and to transfer employees
> from one location or classification to another[.][148]

115.    UPS is required under the CBA to provide "just cause" for the discharge or

suspension of any employee.[149]

---

[147]    (*Compare* Dkt. No. 23, Attach. 2, at ¶ 113 [UPS's Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29 at ¶ 113 [Plf.'s Rule 7.1 Response to UPS, purporting to "[d]ispute[]" above-stated fact "to the extent that Plaintiff categorically denies any wrongdoing in the manner in which he sheeted packages," and asserting additional facts, but failing to cite record evidence giving rise to a factual dispute]; *accord*, Dkt. No. 23, Attach. 8, at UPS4144 [Official Discharge Notice, dated 8/3/15].)

[148]    (Dkt. No. 20, Attach. 5, at 240 [CBA, Art. 9].)

[149]    (Dkt. No. 20, Attach. 5, at 202 [CBA, Art. 58, § A].)

116. Moreover, pursuant to the CBA, UPS is required to provide employees at least one warning notice in writing prior to discharge or suspension.

117. Pursuant to Article 7 of the CBA, "an employee to be discharged or suspended shall be allowed to remain on the job, without loss of pay unless and until the discharge or suspension is sustained under the grievance procedure."[150]

118. The CBA grants sole authority to the Supplemental Panel Committee to make "final and binding" decisions at arbitration panel hearings on cases involving discharges or suspensions.[151]

119. The Supplemental Panel Committee "shall be composed of an equal number of employer and union representatives," as well as a neutral professional arbitrator in the event of a tied vote.[152]

120. With regard to arbitration hearings, the CBA provides that "there shall be no more than one (1) cancellation of arbitration dates by either party in the hearing of any single arbitration case, except as permitted by the arbitrator with good cause."[153]

### 3. Plaintiff's Statement of Material Facts in Opposition to Defendants' Respective Motions for Summary Judgment

In opposition to Defendants' respective motions for summary judgment, Plaintiff has filed, "[p]ursuant to Rule 56 of the Federal Rules of Civil Procedure and [Local Rule] 7.1(a)(3)," a 112-paragraph statement of material facts "for which *there are no material genuine issues in*

---

[150]    (Dkt. No. 20, Attach. 5, at 20 [CBA, Art. 7].)

[151]    (Dkt. No. 20, Attach. 5, at 186 [CBA, Art. 6, § 1, ¶ B].)

[152]    (Dkt. No. 20, Attach. 5, at 21 [CBA, Art. 8, § 1].)

[153]    (Dkt. No. 20, Attach. 5, at 27 [CBA, Art. 8, § 7, ¶ 9].)

*dispute*[.]" (Dkt. No. 28, Attach. 1 [emphasis added].) In conjunction with their reply memoranda of law, each Defendant has filed a response to Plaintiff's purported Rule 7.1 Statement. (Dkt. No. 31, Attach. 1 [Union's "Response to Plaintiff's Counterstatement Material [*sic*] Facts"]; Dkt. No. 32, Attach. 1 [UPS's "Response to Plaintiff's Statement of Material Facts"].)

Plaintiff has not cross-moved for summary judgment, and "[n]either the Federal Rules of Civil Procedure nor the Local Rules of Practice permit such a counterstatement in response to a motion for summary judgment." *Binghamton-Johnson City Joint Sewage Bd. v. Am. Alternative Ins. Corp.*, 12-CV-0553, 2015 WL 2249346, at *11 n.1 (N.D.N.Y. May 13, 2015) (Suddaby, J.); *accord*, N.D.N.Y. L.R. 7.1(a)(3) (permitting a non-movant to file a counterstatement of material facts which the non-movant "contends *are in dispute*") (emphasis added). "This, of course, makes sense, given that what is needed for a non-movant to defeat a motion is a genuine dispute of fact; and the only point of asserting undisputed facts would be to prevail on a cross-motion for summary judgment," which, as noted above, has not been filed in this case. *Binghamton-Johnson City Joint Sewage Bd.*, 2015 WL 2249346, at *11 n.1. However, rather than strike Plaintiff's purported Rule 7.1 Statement (or Defendants' responses thereto), the Court will construe it as containing facts that are asserted by Plaintiff to be in dispute for purposes of Defendants' motions.

## C.     Parties' Briefing on Defendants' Motions for Summary Judgment

### 1.     The Union's Memorandum of Law in Support of Its Motion

Generally, in support of its motion for summary judgment, Local 687 advances three arguments: (1) it did not act arbitrarily, given that, each time Plaintiff filed a grievance related to

the escalating discipline against him, Local 687 (a) accepted and processed it through the CBA machinery, (b) met with UPS management in an effort to minimize the penalty imposed, (c) submitted the grievances to arbitration, (d) sought his input with respect to its briefs to the arbitration panel, and (e) arranged to transport him to the hearing (which he declined); (2) it did not discriminate against Plaintiff or act in bad faith, given that (a) it processed his grievances (including those lacking in merit), (b) advocated vigorously on his behalf (even when he chose not to attend the arbitration hearing), and (c) Hammond corresponded with Plaintiff and scheduled meetings with him, even though Plaintiff "stood him up" and had filed baseless charges against the Union with the NLRB; and (3) Plaintiff has not identified any basis from which it may be reasonably inferred that the purported shortcomings identified by him in Local 687's representation (i.e., its failure to obtain certain evidence and records for submission to the arbitration panel) was causally connected with the result of the grievance process. (Dkt. No. 20, Attach. 1, at 4-18 [Union's Memo. of Law].)

### 2. UPS's Memorandum of Law in Support of Its Motion

Generally, in support of its motion for summary judgment, UPS advances four arguments: (1) the Union satisfied its duty of fair representation as a matter of law because (a) it supported each of Plaintiff's grievances and properly initiated the adjudication process under the CBA, (b) Hammond (i) attempted to negotiate a reduction of the discipline imposed against Plaintiff on three separate occasions before arbitration, (ii) met with Plaintiff, gathered evidence, and prepared briefs and exhibits in support of each of Plaintiff's four grievances, (iii) solicited and incorporated Plaintiff's input with respect to his presentation to the arbitration panel, and (iv) attempted to facilitate Plaintiff's presence at the hearing by arranging a car ride with a union

shop steward, (c) it aggressively prosecuted Plaintiff's grievances before the arbitration panel, and (d) Plaintiff testified during his deposition that he had no evidence that the arbitration panel itself had any animus or dislike for him; (2) disagreement with the Union's strategy in mounting its defense of Plaintiff and allegations of neglectful conduct are insufficient to establish that it breached its duty of fair representation; (3) in light of all of the steps taken by the Union on Plaintiff's behalf as outlined above, the Union's acts were not discriminatory or taken in bad faith; and (4) even if Plaintiff could make the "predicate showing" that the Union breached its duty of fair representation, UPS did not breach the CBA because the record establishes that (a) Plaintiff admitted "that he affirmatively engaged in the conduct underlying much of the discipline," and (b) UPS had just cause for discharging Plaintiff (and the arbitration panel agreed).  (Dkt. No. 23, Attach. 1, at 9-21 [UPS's Memo. of Law].)

### 3.    Plaintiff's Combined Opposition Memorandum of Law

Generally, in opposition to Defendants' respective motions, Plaintiff advances two arguments: (1) genuine disputes of material fact exist with respect to whether the Union breached its duty to fairly represent Plaintiff because (a) despite Plaintiff's "repeated requests," Hammond met with him only once to prepare for the arbitration panel hearing and "rarely returned [his] calls,", (b) the Union did not secure exculpatory UPS records and submit them to the arbitration panel, (c) Plaintiff "does not remember" being given an opportunity to review and comment on Hammond's panel submissions, and (d) the Union failed (intentionally and in bad faith) to advance certain arguments during the arbitration process that Plaintiff asked it to pursue;[154] and (2) genuine disputes of material fact exist with respect to whether the Union's

_____

[154]    More specifically, Plaintiff faults Local 687 for failing to argue that (i) UPS did not follow uniform sheeting practices, had a "policy and culture" of falsifying business

conduct was causally related to the termination of his employment because (a) the claims that

Plaintiff asked the Union to argue depended not upon the Union's interpretation of the CBA's

provisions but "merely upon a reasonable investigation of Plaintiff's defenses" and familiarity

with his rights, (b) his job would have been "saved" because the arbitration panel would have

declined to consider certain uncorroborated evidence submitted against him (i.e., Telematics

evidence), and (c) in one of its statements to the arbitration panel, it conceded Plaintiff's

wrongdoing.  (Dkt. No. 28 at 8-49 [Plf.'s Opp'n Memo. of Law].)

### 4.      The Union's Reply Memorandum of Law

Generally, in reply, Local 687 reiterates the arguments set forth in its memorandum of

law and, moreover, argues as follows: (1) Plaintiff's opposition memorandum of law contains

certain incorrect or misleading statements of the law; (2) Plaintiff's Rule 7.1 Response does not

comply with Local Rule 7.1(a)(3) of the Court's Local Rules of Practice because many of

Plaintiff's denials are "argumentative and non-responsive," lack citations to the record where the

purported factual dispute arises, contain unrelated assertions of fact, and rely on citations to

Plaintiff's undated declaration, which "deviates significantly" in content from his deposition

testimony and constitutes an attempt to "manufacture issues of material fact"; (3) Plaintiff's

argument that the Union failed to challenge UPS's use of non-uniform progressive discipline is

_____

documents to save money, and did not consider "improper sheeting" to be a cardinal infraction
warranting removal before grievance and arbitration procedures are conducted, (ii) UPS violated
Article 6, Section 6 of the CBA in charging him with violating the 9.5 policy and making
duplicate stops, (iii) Plaintiff's discipline was imposed in retaliation for making complaints about
working conditions to OSHA, (iv) UPS does not uniformly follow its own progressive discipline
policy and, with respect to Plaintiff, UPS improperly relied upon prior disciplinary actions
that were still being challenged when taking disciplinary action on subsequent charges, and (v) UPS
discriminated against him as the sole driver discharged for violation of the 9.5 policy while four
"comparators" who also violated the 9.5 policy received a warning letter.  (Dkt. No. 28 at 15-44.)

lacking in merit because (a) it is based on a misreading of the CBA, which does not prohibit such escalating discipline, and (b) Plaintiff admits that UPS issued him, for successive workplace infractions, a written warning, successive suspensions, and, ultimately, a working discharge; (4) Plaintiff's argument that the Union failed to challenge UPS's violation of CBA Article 6 (which prohibits a discharge based solely on information gathered from Telematics, UPS's GPS system) is lacking in merit because Plaintiff's discharge was the result of Plaintiff's progressive discipline, as well as his own admission of conduct violating UPS sheeting policy; (5) a fact finder could not reasonably infer that he was subjected to discrimination based on the penalties he received for his rule violations compared to those received by any other employees because the penalties imposed were a function of his specific progressive discipline; (6) a fact finder could not reasonably infer that he was subjected to retaliation because the record demonstrates that (a) he was terminated due to his "inability to conform to workplace rules," and (b) the termination was imposed six months after he made complaints to OSHA; and (7) a disagreement with strategic choices made by the Union, including with respect to the evidence presented and arguments made to the arbitration panel, does not establish a breach of the duty of fair representation. (Dkt. No. 31 [Union's Reply Memo. of Law].)

### 5. UPS's Reply Memorandum of Law

Generally, in reply, UPS reiterates the arguments set forth in its memorandum of law and, moreover, argues as follows: (1) Plaintiff's declaration should be stricken because it contains assertions that (a) contradict his deposition testimony, (b) constitute legal conclusions, and (c) are not based on Plaintiff's personal knowledge;[155] (2) those paragraphs in Plaintiff's Rule 7.1

---

[155] More specifically, UPS argues that paragraphs 8, 12, 21, 26, 36, 39, 48, 50-51, 58, and 66-69 of Plaintiff's declaration are improper, "among other sham statements made in direct

Response (as well as purported Rule 7.1 Statement) that rely upon the improper assertions in his declaration should be stricken for the same reasons;[156] (3) Plaintiff has failed to identify any admissible evidence from which a fact finder could reasonably infer that the Union breached its duty of fair representation; (4) the alleged omissions identified by Plaintiff constitute, at worst, negligence or "an 'ultimately wrong' judgment," neither of which rises to the level of a breach of the duty of fair representation; (5) to the extent that Plaintiff asserts in his declaration that he "does not remember" whether certain events occurred with respect to the Union's efforts to represent him during the grievance process, these assertions are insufficient to create a genuine dispute of material fact; (6) Plaintiff has failed to identify any admissible record evidence from which a fact finder could reasonably infer that UPS breached the CBA; (7) Plaintiff's arguments that (a) certain of the charges were supported by only GPS data (without corroborating evidence) and (b) UPS did not uniformly enforce certain of its policies neither constitute a defense to his conduct nor create a material dispute of fact with respect to his claims; (8) CBA Article 6, Section 6, which provides that an employee may not be discharged based solely on information received from GPS or Telematics data, excludes situations in which an employee engaged in dishonesty (as Plaintiff did here); and (9) Plaintiff was ultimately discharged on four distinct grounds, based upon not only Telematics data, but also supervisors' memoranda and meetings held with Plaintiff.  (Dkt. No. 32 at 1-8 [UPS's Reply Memo. of Law].)

_____

contradiction to [his] prior deposition testimony . . . as well as his . . . statement of facts . . . ."  (Dkt. No. 32 at 2-3.)

[156]    More specifically, UPS argues that paragraphs 6, 10, 17, 22, 29, 42, 47, and 50 of Plaintiff's purported Rule 7.1 Statement, and paragraphs 43, 52, 58, 70, and 76-88 of his Rule 7.1 Response, "attempt to 'spin' facts to avoid admissions."  (Dkt. No. 32 at 2 n.1.)

## II.  LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[157]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.  In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to

---

[157]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

perform an independent review of the record to find proof of a factual dispute.[158]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[159]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[160] Stated another way, when a non-movant fails to oppose a legal argument

---

[158]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[159]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[160]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to

asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

After carefully considering the matter, the Court grants Defendants' respective motions for summary judgment for the reasons stated in Defendants' memoranda of law and reply memoranda of law.  (Dkt. No. 20, Attach. 1, at 4-18 [Union's Memo. of Law]; Dkt. No. 23, Attach. 1, at 9-22 [UPS's Memo. of law]; Dkt. No. 31 at 7-10 [Union's Reply Memo. of Law]; Dkt. No. 32 at 3-8 [UPS's Reply Memo. of Law].)  To those reasons, the Court adds seven points, which are intended to supplement (and not to supplant) those reasons.

First, Defendants' arguments concerning the defects in Plaintiff's Rule 7.1 Responses are well taken.  However, the Court declines to strike some or all of his Rule 7.1 Responses (or Plaintiff's declaration).  Instead, the Court has carefully reviewed Defendants' Rule 7.1 Statements and Plaintiff's Rule 7.1 Responses, resulting in the undisputed material facts set forth above in Part I.B.1. and Part I.B.2. of this Decision and Order.

---

oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

Second, as noted above, although Plaintiff's Complaint contains two "Counts," the Court construes Plaintiff's Complaint to allege a single "hybrid" claim pursuant to section 301 of the LMRA, 29 U.S.C. § 185(a).[161] "To establish a hybrid § 301/[duty of fair representation] claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 178 (2d Cir. 2001); *accord*, *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983); *Hofmann v. Schiavone Contracting Corp.*, 630 F. App'x 36, 39 (2d Cir. 2015) (summary order). "The plaintiff may sue the union or the employer, or both, but must [establish] violations on the part of both." *White*, 237 F.3d at 179.[162] Stated otherwise, "the[se] two claims are inextricably interdependent. To prevail against either the company or the [u]nion, [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the [u]nion." *DelCostello*, 462 U.S. at 164-65 (internal quotation marks and ellipses omitted).[163] "The indispensable predicate for such an action is . . . a demonstration that

---

[161]    The Court construes Plaintiff's Complaint in this manner based on the nature of its factual allegations and the two "Counts" (one asserted against the Union and the other against UPS, Plaintiff's employer), as well as its express reliance upon 29 U.S.C. § 185. (Dkt. No. 1.) Moreover, the Court notes that Plaintiff characterizes this case as a "hybrid action" in his opposition memorandum of law. (Dkt. No. 28 at 1.)

[162]    "Section 301 of the LMRA governs the employer's duty to honor the collective bargaining agreement, and the duty of fair representation is implied from § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a)." *White*, 237 F.3d at 179 n.3.

[163]    *See also Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 33 (2d Cir. 2000) ("Such suit, which alleges that the employer breached the CBA and that the union breached its duty of fair representation, is known as a hybrid § 301/fair representation claim. The employee may sue the employer, the union, or both in a hybrid § 301/fair representation claim; to prevail the employee must not only show that [his or her] discharge was contrary to the contract, but must also carry the burden of demonstrating breach of duty by the Union.") (internal citations and quotation marks omitted).

the [u]nion breached its duty of fair representation." *Saluja v. Local 1199 Un. Healthcare Workers E.*, 363 F. App'x 91, 93 (2d Cir. 2010) (summary order) (internal quotation marks omitted).

A plaintiff asserting a claim for breach of the duty of fair representation must prove two elements: (1) "conduct toward a member of the bargaining unit [that] is arbitrary, discriminatory, or in bad faith"; and (2) "a causal connection between the union's wrongful conduct and [his or her] injuries." *White*, 237 F.3d at 179 (internal quotation marks omitted); *accord, Marquez v. Screen Actors Guilt, Inc.*, 525 U.S. 33, 44 (1998). A union acts arbitrarily "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *White*, 237 F.3d at 179 (internal quotation marks omitted). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Id.* (quoting *Marquez*, 525 U.S. at 45-46). "[T]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Vaughn v. Air Line Pilots Ass'n, Intern.*, 604 F.3d 703, 709 (2d Cir. 2010) (quoting *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43 [2d Cir. 1989]); *accord, Messina v. 1199 SEIU United Healthcare Workers E.*, 453 F. App'x 25, 27 (2d Cir. 2011) (summary order) ("A union's DFR is not breached where the union fails to process a meritless grievance, fails to process a grievance due to error in evaluating its merits, engages in mere negligent conduct or errors in judgment, or decides not to arbitrate a grievance[.]") (internal citations omitted).

"A showing of '[b]ad faith requires a showing of fraudulent, deceitful, or dishonest action.'" *White*, 237 F.3d at 179 (quoting *Sim v. New York Mailers' Union No. 6*, 166 F.3d 465,

472 [2d Cir. 1999]). "A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" *Vaughn*, 604 F.3d at 709 (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 [1971]).

Third, with respect to Plaintiff's arguments related to Hammond's availability to him (i.e., his arguments that he "did not have access to Hammond," that Hammond "rarely returned [his] calls" and met with him only "a single time" to prepare for the arbitration panel hearing, and that Plaintiff "does not remember being allowed an opportunity to review Hammond's statements [to be submitted to the arbitration panel] to make any desired changes"), Plaintiff has failed to identify any basis in the record for concluding that Hammond's availability (or lack thereof) constituted a violation of the Union's duty to fairly represent Plaintiff, or was causally connected to the discipline Plaintiff ultimately received.[164] Despite his unsubstantiated assertion that Hammond was "physically present" at the Union's Potsdam office "once every couple months," the record evidence establishes that Hammond was regularly available via e-mail, proposed a specific date on which he and Plaintiff could meet in May 2015 (a proposal of which Plaintiff did not take advantage),[165] prepared written briefs on Plaintiff's behalf to be submitted in support of his grievances related to his discipline,[166] and solicited (and received) from Plaintiff recommended alterations to, as well as photographic exhibits to accompany, the briefs.[167] Before

---

[164]    (Dkt. No. 28 at 17-19 [Plf.'s Opp'n Memo. of Law].)

[165]    Union Fact No. 155 in Part I.B.1. of this Decision and Order.

[166]    Union Fact No. 186 in Part I.B.1. of this Decision and Order.

[167]    Union Fact Nos. 186-87 in Part I.B.1. of this Decision and Order.

Plaintiff's grievances were presented to the arbitration panel, Hammond represented Plaintiff at UPS disciplinary meetings and attempted to negotiate lesser forms of discipline in connection with Plaintiff's numerous infractions.[168]  In light of this record evidence, Plaintiff's conclusory assertions that Hammond was at his Potsdam office "once every couple of months" and met with Plaintiff one time before his arbitration panel hearing[169] provide no basis from which a rational factfinder could infer that the Union did not exercise adequate competence in its representation, much less that it acted arbitrarily, in bad faith, or in a discriminatory manner towards him.  *See, e.g., Jordan v. Viacom Outdoor Grp.*, 475 F. Supp. 2d 440, 446 (S.D.N.Y. 2007) ("[Plaintiff] criticizes [the business agent] for allegedly representing him poorly, but [plaintiff] fails to offer any evidence to show that [the business agent]'s conduct was the result of arbitrary conduct, discrimination or bad faith.  Even if [plaintiff] were correct and [the union business agent] did not carry out his duties with a satisfactory level of care and competence–and there is no showing of that–under Second Circuit law mere negligence does not constitute a breach of the duty of fair representation.").

Fourth, with respect to his argument that the Union failed to argue that UPS did not follow uniform sheeting practices (Dkt. No. 28 at 21-28 [Plf.'s Opp'n Memo. of Law]), Plaintiff's assertions in support of this argument do not provide a basis from which a rational factfinder could infer that the Union violated its duty of fair representation.  As an initial matter, Plaintiff mischaracterizes the nature of a "cardinal infraction" by suggesting that such an infraction is one "involving alcohol, drugs, violence or sexual harassment," and arguing that

---

[168]     Union Fact Nos. 67, 75-78, 117-19, 126 in Part I.B.1 of this Decision and Order.

[169]     (Dkt. No. 28, Attach. 3, at ¶¶ 35-36 [Plf.'s Decl.].)

Plaintiff "was clearly not involved in any of these prohibited activities." (Dkt. No. 28 at 22 [Plf.'s Opp'n Memo. of Law].) However, the basis for Plaintiff's non-working discharge for improper sheeting was that his conduct constituted dishonesty. Article 58 of the CBA provides that "no warning notice [of possible suspension or termination] need be given to any employee before he/she is discharged if the cause of such discharge *is dishonesty*," or the other forms of misconduct enumerated in Plaintiff's opposition memorandum of law. (Dkt. No. 20, Attach. 5, at 202 [CBA, Art. 58] [emphasis added].) Accordingly, the Court finds that Plaintiff's argument that the Union failed to raise a "Due Process argument" to the arbitration panel, based on the fact that Plaintiff "never received a written warning or any other form of progressive discipline from UPS," is lacking in merit.[170]

Moreover, with respect to Plaintiff's grievance in Case No. 23-15 (which involved his alleged improper sheeting and resulted in UPS's imposition of a working discharge), the Union argued on Plaintiff's behalf that he "did not violate any of UPS' policy or procedures when attempting to make a delivery on Ford Street in Ogdensburg, New York." (Dkt. No. 23, Attach. 8, at 5 of CM/ECF pagination [Union's Brief in Case No. 23-15].) Rather, the Union argued that

---

[170]    As set forth in detail above, Plaintiff received progressive discipline–ranging from a written warning to multiple working discharges–in 2015. Union Fact Nos. 86, 105, 109, 124, 141-42 in Part I.B.1 of this Decision and Order. Plaintiff's August 3, 2015, non-working discharge was not the subject of any of the four grievances brought before the arbitration panel. The arbitration panel upheld the discharge that was the subject of Plaintiff's grievance in Case No. 23-15 (which concerned Plaintiff's improper sheeting of deliveries in April 2015). Union Fact No. 142 in Part I.B.1 of this Decision and Order. Plaintiff's August 3, 2015, cardinal infraction also involved improper sheeting and "falsification of records[.]" (Dkt. No. 20, Attach. 36 [Official Discharge Notice, dated 8/3/15].) During his deposition, Plaintiff testified that, in relation to his August 3, 2015, non-working discharge, he was "asked if [he] had signed somebody else's name on the board, which [he] had not," and that his grievance regarding this discharge had not yet been heard by the arbitration panel. (Dkt. No. 21, Attach. 2, at 333 [Plf.'s Depo. Tr.].)

Plaintiff "followed his met on road training to the letter." (*Id.*) As a result, Plaintiff's argument that he recorded his stops in the manner that he was taught (Dkt. No. 28 at 23 [Plf's Opp'n Memo. of Law]) was, in sum and substance, actually presented to the arbitration panel in the Union's brief with respect to Case No. 23-15.

Although Plaintiff argues that the Union "[i]nexplicably" failed to present to the arbitration panel records from another UPS driver, Bjork, despite Plaintiff's "express instructions" that the Union do so, the Court concludes that the record evidence supports the conclusion that this alleged oversight was, at most, negligent.[171] Plaintiff argues that Bjork's records show that, like Plaintiff, Bjork "did not use a 'duplicate stop' on the DIAD, when he made a delivery and found additional packages afterwards." (Dkt. No. 28 at 24.) Even if true, Bjork's records have no clear connection to Plaintiff's conduct as a UPS driver, and do not alter the fact that UPS had written Stop Recording procedures in place.[172] In sum, while Bjork's records may have supported the conclusion that Plaintiff was not the only UPS driver who did not record "duplicate stops" on his DIAD in certain situations, the Court concludes that a factfinder could not reasonably infer that the Union acted arbitrarily or in bad faith in failing to present this evidence to the arbitration panel.[173]

---

[171]    During his deposition, when asked why he did not submit Bjork's records to the arbitration panel as Plaintiff requested, Hammond testified that, although he obtained Bjork's records, he left them at Plaintiff's house (as Plaintiff had also requested). (Dkt. No. 21, Attach. 3, at 125-26 [Hammond Depo. Tr.].) Moreover, Hammond testified that he "didn't make copies" of Bjork's records. (*Id.* at 126.)

[172]    UPS Fact No. 57 in Part I.B.2. of this Decision and Order.

[173]    Notably, Plaintiff testified during his deposition that, even after he was issued a working discharge for improper sheeting in April 2015, he continued to record deliveries in the same manner. (Dkt. No. 21, Attach. 2, at 331-32 [Plf.'s Depo. Tr.].) Moreover, Plaintiff testified that he "assumed that [UPS] was going to fire me for anything they felt like firing me for." (*Id.* at 332.)

Fifth, with respect to his argument that the Union failed to argue that UPS violated Article 6, Section 6 of the CBA, the Court finds that this argument does not support a reasonable inference that the Union acted arbitrarily, in bad faith, or in a discriminatory manner. As an initial matter, Article 6, Section 6 of the CBA, titled "Technology and Discipline," provides, in pertinent part, that "[n]o employee shall be discharged if such discharge is based *solely upon* information received from GPS or any successor system *unless he/she engaged in dishonesty . . . . The Company must confirm by direct observation or other corroborating evidence any other violations warranting discharge.*" (Dkt. No. 20, Attach. 5, at 19 [CBA, Art. 6, § 6] [emphasis added].) In this case, the parties do not dispute that Plaintiff's final (non-working) discharge was predicated upon UPS's finding that he acted dishonestly. The "Technology and Discipline" provision was therefore not applicable to this discharge. Moreover, the record demonstrates that the working discharge imposed against Plaintiff following the meeting held on April 17, 2015 (and which was upheld by the arbitration panel), was based upon not only Telematics evidence, but other evidence, including Plaintiff's own statements at the meeting that he documented deliveries in the DIAD in the manner that he had been trained.[174] Finally, as Plaintiff himself notes, on June 5, 2015, UPS issued another working discharge for Plaintiff's violation of the 9.5 policy, based upon not only Sebastian-Dean's review of Telematics evidence, but also Plaintiff's timecard entries and statements that he made at the disciplinary meeting. (Dkt. No. 28 at 30-31 [Plf.'s Opp'n Memo. of Law]; *accord*, Dkt. No. 28, Attach. 20 [Memorandum from Sebastian-Dean, dated 5/5/15].) In sum, Plaintiff's argument regarding UPS's alleged breach of the CBA's "Technology and Discipline" provision is lacking in merit, and he has identified no basis upon which a rational factfinder could infer that the Union violated its duty to fairly represent him by

---

[174]     Union Fact Nos. 123-25 in Part I.B.2. of this Decision and Order.

not advancing this argument before the arbitration panel.[175]

Sixth, with respect to his argument that the Union failed to argue to the arbitration panel that UPS disciplined him in retaliation for filing an OSHA complaint, the Court notes only that (1) the Union actually referenced Plaintiff's suspicion of retaliation in its brief regarding Case No. 23-15,[176] (2) the record suggests that Hammond was aware of Plaintiff's suspicion (given that Plaintiff conveyed it in multiple e-mails and in one of the grievances), but made the strategic decision not to press this argument with greater force because it was unlikely to be successful,[177] and (3) irrespective of the degree of temporal proximity between Plaintiff's OSHA complaint (which was allegedly made in or about February 2015) and the subsequent progressive discipline

---

[175] In the alternative, the Court finds that, *even if* this argument "would have changed the Panel result"–a conclusion that, again, is not supported by the record–the evidence establishes that the Union's failure to argue it was, at most, negligent. "[A]t best, the Union's failure to make the arguments Plaintiff suggests should have been made, or take the actions Plaintiff suggests should have been taken, are mere tactical errors on the part of the Union, which are insufficient to make out a claim for breach of the duty of fair representation. Union officials are not attorneys, and should not be held to a standard akin to legal malpractice." *Smith v. Drug, Chemical, Cosmetic, Plastics & Affiliated Indus. Warehouse Emps. Local 815*, 943 F. Supp. 224, 241 (E.D.N.Y. 1996) (internal citations omitted); *accord, Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 202 (E.D.N.Y. 1998); *see also Adonna v. United Elec., Radio & Machine Workers of Am. Local 243*, 08-CV-1245, 2011 WL 721525, at *10 (D. Conn. Feb. 23, 2011) ("[A] breach of the duty of fair representation is not established merely by proof that an underlying grievance was meritorious. Instead, a union is only required to make decisions regarding the merits of a grievance in a good faith, and non-arbitrary manner.") (internal citations omitted). Moreover, Plaintiff's argument that "[t]he use of Telematics in this case" was "discriminatory, excessive and unreasonable monitoring that invaded [his] reasonable expectation of privacy" is simply a conclusory mishmash of legal jargon, in support of which he has cited no case law.

[176] (Dkt. No. 20, Attach. 21 [Union Brief in Case No. 23-15] [noting that Plaintiff "believes" that he was being disciplined "because of his complaint to OSHA which made the company address safety issues at the facilty"].)

[177] (Dkt. No. 21, Attach. 3, at 164 [Hammond Depo. Tr.] ["I'm not sure they were doing anything about OSHA complaints. What I was sure of is that they were using progressive discipline to change Rob's behavior."].)

imposed, the record does not support the reasonable inference that Plaintiff was disciplined in retaliation given the intervening circumstances (namely, Plaintiff's misconduct). Nothing in the record suggests that the Union's failure to further argue that Plaintiff was being subjected to retaliation was the result of the Union's arbitrary, bad-faith, or discriminatory conduct.

Seventh, and finally, with respect to his argument that the Union failed to argue to the arbitration panel that Plaintiff was subjected to discrimination because he was "the sole driver discharged for violation of the 9.5 Rule" (Dkt. No. 28 at 43 [Plf.'s Opp'n Memo. of Law]), the record demonstrates that the discipline meted out to Plaintiff was a function of Plaintiff's multiple work-related infractions and the application of progressive discipline under the CBA.[178] Plaintiff's argument that four other drivers were disciplined, but not discharged, for violating the 9.5 policy, does not support a reasonable inference that the Union engaged in conduct that was "intentional, severe, and unrelated to legitimate union objectives." *Vaughn*, 604 F.3d at 709; *see also, e.g. Jordan*, 475 F. Supp. 2d at 446 & n.4 (explaining that plaintiff's arguments concerning discipline imposed against other employees in other instances "documents [the employer's] disciplinary actions–not the efforts undertaken by the Union on behalf of its members–and therefore is irrelevant to the question of whether the Union breached its duty of fair

---

[178]    In light of the nature of his assertions in this case, the Court finds puzzling Plaintiff's obstinate refusal to write down Milne's cell phone number as directed, so that he could contact Milne if and when his shift was going to exceed 9.5 hours. Union Fact Nos. 26-29, 34, 41 in Part I.B.2. of this Decision and Order. Plaintiff testified during his deposition that he thought it was outside the scope of Milne's authority to require a driver to call his cell phone. (Dkt. No. 21, Attach. 2, at 295-96 [Plf.'s Depo. Tr.].) However, the 9.5 policy was implemented by Sebastian-Dean (and not Milne) and, in any event, Plaintiff appears to have flouted this directive at his own peril, given that he violated the 9.5 policy again soon after being told to write down Milne's phone number (and failing to do so).

representation").[179]

For each of these reasons, as well as those set forth in Defendants' memoranda of law and reply memoranda of law, the Court concludes that Defendants have demonstrated their entitlement to judgment with respect to Plaintiff's hybrid LMRA § 301 claim, and that Plaintiff has failed to raise a genuine dispute of material fact in opposition. The record evidence provides no basis from which a rational factfinder could infer that the Union's representation of Plaintiff fell "so far outside a 'wide range of reasonableness,' as to be irrational," or that the Union's conduct was arbitrary, discriminatory, or undertaken in bad faith. *White*, 237 F.3d at 179; *see also, e.g., Romero v. DHL Express, Inc.*, 12-CV-1942, 2015 WL 1315191, at *9 (S.D.N.Y. Mar. 24, 2015) ("Although ultimately unsuccessful, there is no evidence (apart from Plaintiff's bald assertions) that the Union acted in bad faith or in a manner that was arbitrary or discriminatory."). Defendants' motions for summary judgment are therefore granted.[180]

---

[179]     Plaintiff's reliance on *Berube v. Great Atl. & Pac. Tea Co., Inc.*, 348 F. App'x 684 (2d Cir. 2009) (summary order), is misplaced because that case involved an employee's claims of discrimination under the Age Discrimination in Employment Act and Americans with Disabilities Act, and not a claim that a union violated its duty of fair representation to its members. (Dkt. No. 28 at 43 [Plf.'s Opp'n Memo. of Law].)

[180]     Because the Court concludes that, as a matter of law, the Union has established that it did not breach its duty of fair representation, it need not decide whether UPS breached the CBA. *See, e.g., Saluja*, 363 F. App'x at 93 ("Because Saluja failed to establish that the Union's conduct was arbitrary, discriminatory, or in bad faith, the district court appropriately did not consider whether the Union's conduct caused his injuries, or whether the Hospital breached the collective bargaining agreement."); *Young v. U.S. Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990) (noting that "the Union's breach is a prerequisite to consideration of the merits of plaintiff's claim against her former employer for improper discharge"); *Torres v. Int'l Bhd. of Teamsters*, 13-CV-5352, 2015 WL 774679, at *5 (S.D.N.Y. Feb. 20, 2015) ("Because a union's breach of the duty of fair representation is a prerequisite to consideration of the merits of plaintiff's claim against an employer for breach of a CBA, courts presented with hybrid claims need not reach the question of whether the employer violated the CBA, unless the union has [breached the duty of fair representation by] act[ing] arbitrarily, in bad faith, or discriminatorily.") (internal quotation marks omitted); *see generally Pinkney v. Progressive Home Health Servs.*, 367 F. App'x 210, 212 (2d Cir. 2010) ("Failure to establish that the union breached its duty of fair representation necessarily precludes the claim against the employer.").

**ACCORDINGLY**, it is

**ORDERED** that Defendant Teamsters Local 687's motion for summary judgment (Dkt. Nos. 20-21) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Defendant United Parcel Service, Inc.'s motion for summary judgment (Dkt. No. 23) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment for Defendants and close this case.

Dated: August 29, 2017
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge